# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-CA-01345-SCT

*VICKSBURG PARTNERS, L.P., BOND, JOHNSON AND BOND, INC., MAGNOLIA MANAGEMENT CORPORATION, MAGNOLIA MANAGEMENT SERVICES OF MISSISSIPPI, INC., JOE BANNON, GEORGE T. JOHNSON AND PEGGY MINGEE*

*v.*

*ANGELA STEPHENS, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE ESTATE OF LEROY TAYLOR*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/04/2004 |
| TRIAL JUDGE: | HON. ISADORE W. PATRICK, JR. |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | BENJAMIN CONNELL HEINZ |
| | WILLIAM R. LANCASTER |
| | LOUIS HUNTER COMPTON, JR. |
| ATTORNEY FOR APPELLEE: | PRO SE |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | REVERSED AND REMANDED - 09/22/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1. This case comes to us on appeal from a circuit court order denying a motion to stay proceedings and enforce an arbitration clause contained within the relevant nursing home admissions agreement. Finding that the arbitration clause is valid and enforceable, except as hereinafter discussed, we reverse the judgment of the circuit court and remand this case to the

Circuit Court of Warren County with directions to submit this case to arbitration consistent with this opinion.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2.     Serving as the responsible party, Angela Stephens  admitted her father, Leroy Taylor to the Vicksburg Trace Haven Nursing Home ("the Nursing Home") on April 26, 2001. Stephens and Taylor underwent normal check-in procedures, and each was asked to read and sign an admissions agreement.   Their signatures, along with the signature of a representative from the Nursing Home, were required to complete the admissions agreement. Contained within the admissions agreement was an arbitration clause.  Section F stated:

> The Patient and Responsible Party agree that any and all claims, dispute and/or controversies between them and the Facility shall be resolved by binding arbitration administered by the American Arbitration Association. The Arbitration shall be heard and decided by one qualified Arbitrator selected by the Facility.  The Parties agree that the decision of the Arbitrator shall be final.  All Parties hereto agree to arbitration for their individual respective anticipated benefit of reduced costs of pursuing resolution of a claim, dispute or controversy, should one arise.  All Parties hereto are hereby waiving all rights to a jural trial.

¶3.     The arbitration clause, which was located on the last page of the admissions agreement above the appropriate signature lines, was accompanied by an acknowledgment typed in all caps, bold faced, paragraph-form, in larger font, and stating:

> THE UNDERSIGNED ACKNOWLEDGE THAT EACH OF THEM HAS READ AND UNDERSTOOD THIS AGREEMENT, INCLUDING THE ARBITRATION PROVISION AND HAS RECEIVED A COPY OF THIS AGREEMENT, AND THAT EACH OF THEM VOLUNTARILY CONSENTS TO AND ACCEPTS ALL OF ITS TERMS AND CONDITIONS.

¶4.    On May 10, 2001, Taylor and Stephens signed a second admissions agreement.[1]

Contained within this second admissions agreement was likewise another arbitration clause

which again required the signatures of the three interested parties - Taylor, Stephens and a

representative from the Nursing Home.   The arbitration clause was printed in boldfaced type

equal to or larger than the type found elsewhere in the admissions agreement and was, as with

the first agreement, located in Section F on the last page, just above the signature lines and

consent statement.    This arbitration clause contained in the second admissions agreement

stated:

> The Resident and Responsible Party agree that any and all claims and/or
> controversies between them and the Facility or its Owners, officers, directors
> or employees shall be resolved by binding arbitration administered by the
> American Arbitration Association and its rules and procedures. The Arbitration
> shall be heard and decided by one qualified Arbitrator selected by mutual
> agreement of the parties. Failing such agreement each party shall select one
> qualified Arbitrator and the two selected shall select a third. The Parties agree
> that the decision of the Arbitrator(s) shall be final. The Parties further agree that
> the Arbitrators shall have all authority necessary to render a final, binding
> decision of all claims and/or controversies and shall have all requisite  powers
> and obligations. If the agreed method of selecting an Arbitrator(s) fails for any
> reason or the Arbitrator(s) appointed fails or is unable to act or the successor(s)
> has not been duly appointed, the appropriate circuit court, on application of a
> party, shall appoint one Arbitrator to arbitrate the issue. An Arbitrator so
> appointed shall have all the powers of the one named in this Agreement. All
> Parties hereto agree to arbitration for their individual respective anticipated
> benefit of reduced costs of pursuing a timely resolution of a claim, dispute or
> controversy, should one arise. The Parties agree to share equally the costs of
> such arbitration regardless of the outcome. Consistent with the terms and

---

[1]The first paragraph of this second admissions agreement states in part "as of this __ ___ day of
_____, 200__." These blanks are completed in ink as follows: "as of this 10th day of May, 2002." This date
is obviously wrong since the record clearly reveals that the date of execution of this second admissions
agreement was May 10, 2001. However, the incorrect year in this second admissions agreement is of no
consequence in today's case.

conditions of this Agreement, the Parties agree that the Arbitrator(s) may not award punitive damages and actual damages awarded, if any, shall be awarded pursuant to Section E.7.[2]

¶5. Taylor resided at the Nursing Home until November 20, 2002, when he passed away due to alleged failures in the care provided by the Nursing Home during his residency. Based on these alleged failures, Stephens filed this suit individually and on behalf of the estate and the wrongful death beneficiaries of Taylor. The complaint was filed on December 27, 2002, and it named as defendants Vicksburg Partners, L.P.; Vicksburg Associates Corp.; Bond, Johnson & Bond, Inc.; Magnolia Management Corporation; George T. Johnson; Peggy Mingee; Eva H. Williams; John Does 1 through 10; and unidentified entities 1 through 10 (as to Vicksburg

---

[2]Contrary to the arbitration clause in this second admissions agreement, the arbitration clause in the first admissions agreement provided for an arbitrator to be selected only by the facility (nursing home); however, the arbitration clause in the second admissions agreement provided for one arbitrator to be selected by mutual agreement of the parties to the agreement, and failing agreement, then each party would select an arbitrator, with the two designated arbitrators then selecting a third arbitrator. Other noted differences are that this second arbitration clause provides for equal sharing of the arbitration costs, regardless of the outcome of the arbitration. Also, this second arbitration clause omits language regarding the parties' waiver of a jury trial, which language is in the first arbitration clause. Finally, the second arbitration clause contains language disallowing the arbitrator(s) award of punitive damages and limits actual damages awarded by referencing Section E.7 of the admissions agreement. Section E.7 contains language in bold-type, more prominent than the language of paragraphs six and eight which appear immediately above and below, respectively, paragraph seven. Section E.7 states:

> Should any claim, dispute or controversy arise between the Parties or be asserted against any of the Facility's owner's (sic), officers, directors or employees, the settlement thereof shall be for actual damages not to exceed the lesser of a) $50,000 or b) the number of days the Resident was in the Facility multiplied times the daily rate applicable to said Resident. This limitation of liability shall be binding on Resident, Responsible Party and the Resident's heirs, estate and assigns.

Section E.8 states that the parties agree to waive punitive damages "against each other." This limitation of liability/damages as provided in Sections E.7 and E.8 will be discussed later in this opinion.

4

Trace Haven Nursing Facility) ("Vicksburg Partners").[3] Prior to any responsive pleadings being filed, Stephens filed an amended complaint on March 13, 2003. *See* Miss. R. Civ. P. 15(a). By the time of the filing of the amended complaint, Stephens had received a chancery court appointment as Administratrix of her father's estate; therefore, the amended complaint provided that she was also bringing the suit as the administratrix of the estate of Leroy Taylor.

The eight-count amended complaint contained claims of (1) negligence as to specified defendants; (2) negligence as to other specified defendants; (3) medical malpractice; (4) malice and/or gross negligence; (5) fraud; and (6) breach of fiduciary duty; as well as (7) a statutory survival claim; and (8) a statutory wrongful death claim.

¶6. On April 29, 2003, Vicksburg Partners filed their motion to stay proceedings and enforce dispute resolution/arbitration. On May 12, 2003, Stephens filed her response. After conducting two hearings, receiving multiple briefs and allowing limited discovery on the issue, the circuit court entered an order on May 4, 2004, denying Vicksburg Partners' motion to stay and submit to arbitration.

¶7. Shortly thereafter, Vicksburg Partners filed a motion for reconsideration or for an order granting certification for interlocutory appeal. On June 22, 2004, the circuit court denied this motion without addressing Vicksburg Partners' request for certification for Interlocutory appeal. Vicksburg Partners thereafter filed its Petition for Interlocutory Appeal by Permission and Request for Stay. By order entered on August 23, 2004, a three-justice panel of this Court

---

[3]By her subsequently filed second amended complaint, Magnolia Management Services of Mississippi, Inc., was added as a party defendant. Likewise, in the end, the parties to this appeal were not altogether the same as the party-defendants initially named when this lawsuit was first commenced.

considered this petition for interlocutory appeal by permission and request for stay and accepted this petition for filing as a notice of appeal.

¶8.      While the trial court record was being prepared in this case, Stephens's attorneys filed a motion with this Court requesting permission to withdraw as counsel, which motion was eventually granted.   The documentation before us at the time clearly revealed that Stephens did not wish for her trial counsel to represent her on appeal.   Thus, by order entered on March 31, 2005, Stephens was given fourteen days to retain counsel; however, she failed to do so, and therefore, by order entered on April 19, 2005, this Court stated, inter alia, that we deemed Stephens to be proceeding pro se (representing herself), and we further gave her deadlines to submit her appellee's brief.   This she failed to do, and we thus have before us only the brief of Vicksburg Partners.   However, while we have no appellate brief before us on behalf of Stephens, her arguments are fully before us due to the briefs and pleadings submitted to the trial court by her trial attorneys.   We note that while this case was pending in the trial court, Stephens's attorneys filed with that court, inter alia, a 16-page "Plaintiff's Response Opposing Defendants' Motions to Stay Proceedings and Enforce Dispute Resolution/Arbitration Clause," with attachments, and an 11-page "Supplement to Plaintiff's Response Opposing Defendants' Motions to Stay Proceedings and Enforce Dispute Resolution/Arbitration Clause," with attachments. Additionally, after Vicksburg Partners filed with us its Petition for Interlocutory Appeal by Permission and Request for Stay, Stephens, still represented by counsel, filed through her trial counsel, a 9-page Response to Petition for Interlocutory Appeal by Permission and Request for Stay.   From these filings by Stephens's trial attorneys, we

6

clearly have before us in the appellate record the issues and arguments as laid out by Stephens. Thus, while she has no appellate attorney of record, Stephens is hardly unrepresented on appeal regarding her arguments addressing the issues raised by Vicksburg Partners.

**DISCUSSION**

¶9.     This case involves the denial of a motion to enforce a dispute resolution/arbitration clause contained within a nursing home's standard admissions form. This Court applies a de novo standard of review to motions to dismiss and to denials of motions to compel. *Sanderson Farms, Inc. v. Gatlin*, 848 So.2d 828, 834 (Miss. 2003) (citing *Poindexter v. Southern United Fire Ins. Co.*, 838 So.2d 964, 966-67 (Miss. 2003); *East Ford, Inc. v. Taylor*, 826 So.2d 709, 713 (Miss. 2002); *Webb v. Investacorp, Inc.*, 89 F.3d 252, 256 (5th Cir. 1996)). "Whether the circuit court had proper jurisdiction to hear a particular matter is a question of law, and this Court must therefore apply a de novo standard of review to this issue." *Entergy Miss., Inc. v. Burdette Gin Co.*, 726 So.2d 1202, 1205 (Miss. 1998) (citing *Wright v. White*, 693 So.2d 898, 900 (Miss. 1997)).

¶10.    This Court has recognized that arbitration is favored and firmly embedded in both our federal and state laws. *Pass Termite & Pest Control, Inc. v. Walker*, 904 So.2d 1030, 1032-33 (Miss. 2004) (citing *Russell v. Performance Toyota, Inc.*, 826 So.2d 719 (Miss. 2002); *East Ford, Inc. v. Taylor*, 826 So.2d 709 (Miss. 2002); *IP Timberlands Operating Co. v. Denmiss Corp.*, 726 So. 2d 96 (Miss. 1998)). Since our decision in *IP Timberlands*, we have explicitly recognized the applicability of arbitration for resolving disputes and have stated that

7

we will respect the right of an individual or an entity to agree in advance of a dispute to arbitration or other alternative dispute resolution. 726 So. 2d at 104. We have thus endorsed the undisputed province of the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (FAA), and recognized its clear authority to govern agreements formed in interstate commerce wherein a contractual provision provides for alternative dispute resolution. *Id*. at 107. Consistent with federal law, our case law now clearly emphasizes the favored status of arbitration:

> [Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration. The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). This Court has adopted this preference for arbitration. See *Smith Barney, Inc. v. Henry*, 775 So.2d 722 (Miss. 2001); *I.P. Timberlands Operating Co. v. Denmiss Corp.,* 726 So.2d 96, 103-04 (Miss. 1998); *Hutto v. Jordan*, 204 Miss. 30, 36 So.2d 809, 812 (1948).

*East Ford, Inc. v. Taylor*, 826 So.2d at 713.

¶11. United States Supreme Court precedent clearly evidences this preference for arbitration provisions and expressly recognizes that only generally applicable contract defenses, such as fraud, duress, or unconscionability, can be used to invalidate arbitration provisions or agreements contemplated under section 2 of the FAA. *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 1656, 134 L.Ed. 2d 902 (1996). See *Allied-Bruce, Inc. v. Dobson,* 513 U.S. 265, 281, 115 S.Ct. 834, 843 130 L.Ed. 2d 753 (1995); *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 483-484, 109 S.Ct. 1917, 1921-1922, 104

8

L.Ed.2d 526 (1989); *Shearson/Am. Exp. Inc. v. McMahon*, 482 U.S. 220, 226, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987). In this way, the Supreme Court does not allow state courts to single out arbitration provisions for suspect status and "invalidate arbitration agreements under state laws applicable only to arbitration provisions." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. at 687, 116 S.Ct. at 1656. *See Allied-Bruce*, 513 U.S. at 281, 115 S.Ct. at 843; *Perry v. Thomas*, 482 U.S. 483, 492 n.9, 107 S.Ct. 2520, 2527, n.9, 96 L.Ed.2d 426 (1987)).

¶12.   In *Perry*, the U.S. Supreme Court provided clear meaning to the Federal Arbitration Act and stated:

> Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements." *Id*., at 16, 104 S.Ct. 861 (footnote omitted). Section 2, therefore, embodies a clear federal policy of requiring arbitration unless the agreement to arbitrate is not part of a contract evidencing interstate commerce or is revocable "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "We see nothing in the Act indicating that the broad principle of enforceability is subject to any additional limitations under state law."*Keating, supra,* at 11, 104 S.Ct., 858.

*Perry*, 482 U.S. at 489-90, 107 S.Ct. at 2525.

## I.    WHETHER THE AGREEMENT TO ARBITRATE IS PART OF A CONTRACT EVIDENCING INTERSTATE COMMERCE.

¶13.   A threshold determination which must be considered is whether the parties' admission agreement falls within the provisions of § 2 of the Federal Arbitration Act. The FAA requires "that 'we rigorously enforce agreements to arbitrate.'" *East Ford,* 826 So.2d at 713 (citing *Shearson/Am. Exp. Inc. v. McMahon*, 482 U.S. 220, 226, 107 S.Ct. 2332, 2337, 96 L.Ed.2d

9

185 (1987)). Specifically, § 2 of the Federal Arbitration Act, relates to the enforceability of arbitration provisions and provides that:

> A written provision in any maritime transaction or a contract evidencing a transaction *involving commerce* to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or *an agreement in writing to submit to arbitration an existing controversy arising out of such a contract*, transaction, or refusal, shall be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (emphasis added).

¶14. In *Allied-Bruce Terminix Companies v. Dobson*, 513 U.S. 265, 115 S. Ct. 834, 130 L.Ed.2d 753 (1995), a case where the Alabama Supreme Court affirmed the denial of a motion to compel arbitration, the United States Supreme Court examined the breadth of the Federal Arbitration Act and undertook to answer an interpretive question – "how far beyond the flow of commerce does the word 'involving' reach?" *Allied-Bruce Terminix*, 513 U.S. at 273. In answering this question, the Supreme Court concluded that the phrase "involving commerce" is to be interpreted broadly and was the functional equivalent of the phrase "affecting commerce", which signals Congress' intent to exercise its Commerce Clause powers to the fullest extent. *Id*. at 273-74.

¶15. In 2003, the U.S. Supreme Court once again sought to quantify the broad effect of the FAA as implemented through Congress' Commerce Clause power. In *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 123 S.Ct. 2037, 156 L.Ed.2d 46 (2003), the Supreme Court again reviewed an Alabama case where the Alabama Supreme Court refused to enforce arbitration.

Specifically, the case dealt with debt-restructuring agreements which were executed in Alabama by Alabama residents. *Id.* at 54, 123 S.Ct. at 2039.

The Alabama Supreme Court found, inter alia, that these agreements and transactions were not sufficiently a part of interstate commerce so as to trigger FAA applicability. The U.S. Supreme Court explained its interpretation of the Alabama Supreme Court's decision:

> Because there was no showing 'that any portion of the restructured debt was actually attributable to interstate transactions; that the funds compromising the debt originated out-of-state; or that the restructured debt was inseparable from any out-of-state projects, the court found an insufficient nexus with interstate commerce to establish FAA coverage of the parties' dispute.

539 U.S. at 55, 123 S.Ct. at 2039. In reversing the Alabama Supreme Court, the U.S. Supreme Court held that "Congress' Commerce Clause power 'may be exercised in individual cases without showing any specific effect upon interstate commerce' if in the aggregate the economic activity in question would represent 'a general practice...subject to federal control.'" 539 U.S. at 56-57, 123 S.Ct. at 2040 (citing *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236, 68 S.Ct. 996, 92 L.Ed. 1328 (1948). *See also Perez v. United States,* 402 U.S. 146, 154, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971); *Wickard v. Filburn*, 317 U.S. 111, 127-128, 63 S.Ct. 82, 87 L.Ed. 122 (1942).

¶16. This case clearly falls within the broad purview of the Federal Arbitration Act. Accordingly, singular agreements between care facilities and care patients, when taken in the aggregate, affect interstate commerce. As stated in *Alafabco*, "[o]nly the general practice need bear on interstate commerce in a substantial way." 539 U.S. at 57, 123 S.Ct. at 2040 (citing

11

*Maryland v. Wirtz*, 392 U.S. 183, 196-97 n.27, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968);

*NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37-38, 57 S.Ct. 615, 81 L.Ed. 893 (1937).

¶17.    Nursing homes through general practice, which includes basic daily activities like receiving supplies from out-of-state vendors and payments from out-of-state insurance companies or the federal Medicare program, affect interstate commerce.    Moreover, the defendants in this case include a Georgia corporation, a Tennessee corporation and a Louisiana corporation, who collectively contribute to the operation of Vicksburg Partners nursing home, which receives services and goods from out-of-state vendors, takes in out-of-state residents, and receives payments from out-of-state insurance carriers, including federally-accredited Medicare/Medicaid programs.

¶18.    Thus, since the arbitration clause is a part of a contract (the nursing home admissions agreement) evidencing in the aggregate economic activity affecting interstate commerce, the Federal Arbitration Act is applicable and we, therefore, proceed with our discussion concerning whether the relevant contract and arbitration clause were unconscionable.

¶19.    In line with U.S. Supreme Court precedent, we will review the arbitration agreement in this case, paying close attention to the strong federal policy of favoring the enforcement of agreements to arbitrate.    "Absent a well-founded claim that an arbitration agreement resulted from the sort of fraud or excessive economic power that 'would provide grounds for the revocation of any contract', the Arbitration Act 'provides no basis for disfavoring agreements to arbitrate statutory claims by skewing the otherwise hospitable inquiry into arbitrability.'"

12

*Shearson/Am. Exp., Inc.*, 482 U.S. at 226, 107 S.Ct. at 2337 (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 627, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985)).

## II. WHETHER THE CIRCUIT COURT PROPERLY RULED THAT THE ARBITRATION CLAUSE CONTAINED IN THE BODY OF THE PARTIES' ADMISSIONS AGREEMENT WAS PROCEDURALLY UNCONSCIONABLE.

¶20. In denying Vicksburg Partners' motion to enforce arbitration and stay proceedings, the circuit court found that Stephens presented evidence to support her position that "had Mr. Taylor not signed the admissions agreement he would not have been accepted into the nursing home." Specifically, the circuit court found "that the conditions of the agreement were on a `take it or leave it' basis leaving the plaintiff with no bargaining power." The circuit court stressed that Vicksburg Partners failed to present any evidence that an applicant had ever been admitted despite refusing to acquiesce in the arbitration clause. Accordingly, the circuit court found that the arbitration clause created an unenforceable contract of adhesion and stated:

> The Defendants [Vicksburg Partners] asked the Court at the hearing to take judicial notice that there were two(2) other nursing homes operating in the county at the time of Mr. Taylor's admission. Though that is a correct statement of fact, the Court must also take notice that the existence of nursing homes are limited by a statute which requires a Certificate of Need, prior to a nursing home being opened in a particular area. Therefore, the number of openings are limited, accompanied by long waiting lists for admission. After the plaintiff raised the issue and put on evidence in support of the issue, the Court inquired of the Defendants, if it could provide any contract of admission by the Nursing Home, where the arbitration clause had been refused by the applicant and the applicant was still admitted.....[T]he Defendants at said hearing failed to produce any evidence to the contrary.

13

¶21. In its order denying Vicksburg Partners' motion to compel arbitration, the circuit court clearly found that the subject contract was a contract of adhesion. While this finding is important, it is not in and of itself sufficient to substantiate a finding that the arbitration clause made the admissions agreement unconscionable per se. Thus, in addition to a finding that a contract is one of adhesion, a court must still determine whether the arbitration clause included in a contract of adhesion renders the agreement/contract unconscionable.

¶22. In general, the doctrine of "unconscionability has been defined as 'an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to the other party.'" *Entergy Miss., Inc. v. Burdette Gin Co.*, 726 So. 2d 1202, 1207 (Miss. 1998) (citing *Bank of Indiana Nat'l Ass'n v. Holyfield*, 476 F. Supp. 104, 109 (S.D. Miss. 1979)). Conversely, a conscionable provision has been found to bear some reasonable relationship to the risks and needs of the business. *Id*. Specifically, this Court recognizes two types of unconscionability, procedural and substantive, and has readily adopted language from the Mississippi federal district courts when reviewing contract language under the auspices of the Federal Arbitration Act. The dispositive issue in today's case is whether the *arbitration provision* rendered the subject *admissions agreement* unenforceable. Notably, we review all questions concerning unconscionability under the circumstances as they existed at the time the contract was made. *Pridgen v. Green Tree Fin. Servicing Corp.*, 88 F. Supp. 2d 655, 657 (S.D. Miss. 2000) (citing *York v. Georgia-Pacific Corp*., 585 F. Supp. 1265, 1278 (N.D. Miss. 1984)).

¶23. However, before going further, we perhaps ought to clearly bring into focus our discussion concerning the two types of unconscionability – *procedural* unconscionability and *substantive* unconscionability. *Procedural* unconscionability is applicable to the overall formation of the contract in which the subject clause (such as the arbitration clause) is contained, whereas *substantive* unconscionability is applicable only to the subject clause (such as the arbitration clause) itself. Thus, while procedural unconscionability must be discussed as to the formation of the overall contract, it must also be discussed as to the arbitration clause itself, since the arbitration clause is contained within the overall contract. On the other hand, when discussing and applying substantive unconscionability, we are looking only to a particular clause within the contract, such as an arbitration clause. We are not looking at the overall contract. As we stated in *East Ford*:

> The courts have recognized "two types of unconscionability, procedural and substantive." *Pridgen v. Green Tree Fin. Servicing Corp.*, 88 F.Supp.2d 655 (S.D. Miss. 2000) (quoting *York v. Georgia-Pac. Corp.*, 585 F.Supp. 1265, 1278 (N.D. Miss. 1984)). Procedural unconscionability may be proved by showing "a lack of knowledge, lack of voluntariness, inconspicuous print, the use of complex legalistic language, disparity in sophistication or bargaining power of the parties and/or a lack of opportunity to study the contract and inquire about the contract terms." *Id.*
>
> Substantive unconscionability may be proven by showing the terms of the arbitration agreement to be oppressive. *York*, 585 F.Supp. at 1278. Substantively unconscionable clauses have been held to include waiver of choice of forum and waiver of certain remedies.

826 So.2d at 714.

¶24. Procedural unconscionability looks beyond the substantive terms which specifically define a contract and focuses on the circumstances surrounding a contract's formation. Blacks

15

Law Dictionary 1524 (6ᵗʰ ed. 1990). In **Burdette Gin**, this Court outlined procedural

unconscionability as follows:

> The indicators of procedural unconscionability generally fall into two areas: (1) lack of knowledge, and (2) lack of voluntariness. A lack of knowledge is demonstrated by a lack of understanding of the contract terms arising from inconspicuous print or the use of complex, legalistic language, disparity in sophistication of parties, and lack of opportunity to study the contract and inquire about contract terms. A lack of voluntariness is demonstrated in contracts of adhesion when there is a great imbalance in the parties' relative bargaining power, the stronger party's terms are unnegotiable, and the weaker party is prevented by market factors, timing or other pressures from being able to contract with another party on more favorable terms or to refrain from contracting at all. **Holyfield**, 476 F.Supp. at 109-10.

726 So.2d at 1207.

¶25.     As stated, in today's case the circuit court focused on the lack of voluntariness and specifically determined that the standard form contract signed by both Stephens and Taylor was a contract of adhesion.  In **East Ford** this Court described contracts of adhesion as contracts that are "drafted unilaterally by the dominant party and then presented on a 'take it or leave it' basis to the weaker party who has no real opportunity to bargain about its terms.  Such contracts are usually prepared in printed form, and frequently at least some of their provisions are in extremely small print." **East Ford,** 826 So. 2d at 716 (citing **Holyfield**, 476 F. Supp. at 108 (quoting Restatement 2d, Conflicts, § 203, Comment b)).

¶26.     In **East Ford,** this Court found that the arbitration provision contained in an offer to purchase a used truck was procedurally unconscionable.  While we found the clause to be cloaked within the body of the contract, we cited to our holding in **Burdette Gin** and stated:

16

> The fact that an arbitration agreement is included in a contract of adhesion renders the agreement procedurally unconscionable *only where* the stronger party's terms are unnegotiable and "the weaker party is prevented by market factors, timing or other pressures from being able to contract with another party on more favorable terms or to refrain from contracting at all." ***Entergy Miss., Inc.,*** 726 So.2d at 1207 (quoting ***Bank of Indiana, Nat'l Ass'n v. Holyfield,*** 476 F.Supp. at 109-10).

***East Ford,*** 826 So.2d at 716 (emphasis added).

¶27.    Ultimately, we focused on the facts surrounding the arbitration clause and found that it was procedurally unconscionable.    We specifically pointed out that the arbitration provision appeared less than one-third the size of many other terms in the document, appeared in very fine print, regular type font, and observed that all of the details concerning the vehicle were in boldfaced print, while the arbitration provision was not. ***Id***. at 716-17.

¶28.    Importantly, in ***East Ford,*** we discussed the legal effect of a "contract of adhesion" within the context of determining the issue of procedural unconscionability and applied   logic similar to that espoused by the Fifth Circuit in ***Hughes Training Inc. v. Cook***, 254 F.3d 588 (5th Cir.   2001), one year earlier.    In ***Hughes Training***, the Fifth Circuit distinguished contracts of adhesion, arbitration clauses and procedural unconscionability:

> Contracts in which one party has minimal bargaining power, also referred to as contracts of adhesion, *are not automatically void*. *See **Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.***, 961 F.2d 1148, 1154 (5TH Cir. 1992), *cert. denied,* 506 U.S. 1079, 113 S.Ct. 1046, 122 L.Ed.2d 355 (1993); ***In re Oakwood Mobile Homes, Inc.,*** 987 S.W.2d 571, 574 (Tex. 1999). "Instead, the party seeking to avoid the contract generally must show that it is unconscionable." ***Id.*** *"There is nothing per se unconscionable about arbitration agreements."* ***EZ Pawn Corp. v. Mancias,*** 934 S.W.2d 87, 90 (Tex. 1996).

17

254 F.3d at 594 (emphasis added).

¶29.    While Mississippi state and federal precedent has fully addressed the procedural rubric which we employ when analyzing the unconscionability of arbitration provisions, we have not been previously confronted with a case which factually parallels today's case.  To this end, we will buttress our review of procedural unconscionability with some recent decisions from another jurisdiction where the court considered similar admissions agreements involving patients and their care facilities.

¶30.    In *Howell v. NHC Healthcare-Fort Sanders, Inc.*, 109 S.W.3d 731 (Tenn. Ct. App.), a case which was cited by Stephens in her trial court response to Vicksburg Partners' motion to compel, the Tennessee Court of Appeals held that the arbitration clause found within the body of the care facilities' admission agreement was unenforceable.  While the facts in *Howell* presented the same fundamental questions we must address in today's case, the arbitration clause as well as the facts surrounding the execution of the admissions agreement are distinguishable.  In *Howell*, the court found that the arbitration clause, which was located on page ten of an eleven page agreement, was "buried" within the larger document. *Id.* at 734.  In support of this finding, the court noted that the arbitration provision was written in the same size font as the rest of the agreement and did not adequately explain how the arbitration procedure would work. *Id*.  Additionally, the court found that the execution of the agreement militated against enforcement as Ms. Howell had to be placed in a nursing home expeditiously

18

and the admission agreement had to be signed before admission could be accomplished. ***Id.*** at 735.

¶31. In ***Howell***, the Tennessee Court of Appeals relied heavily on the Tennessee Supreme Court's holding in ***Buracynski v. Eyring***, 919 S.W.2d 314 (Tenn. 1996). In ***Buracynski***, the Tennessee Supreme Court found that while the patient-doctor arbitration agreement was a contract of adhesion and was offered to the patient on a "take it or leave it basis", the simple fact that a contract is one of adhesion does not necessarily render it unenforceable. *Id*. at 320. The Tennessee Supreme Court examined the issue of enforceability and stated:

> [I]n general, courts are reluctant to enforce arbitration agreements between patients and health care providers when the agreements are hidden within other types of contracts and do not afford the patients an opportunity to question the terms or purpose of the agreement. This is so particularly when the agreements require the patient to choose between forever waiving the right to a trial by jury or foregoing necessary medical treatment, and when the agreements give the health care provider an unequal advantage in the arbitration process itself.

***Id.*** at 321. In determining that the arbitration clause at issue in its case was enforceable, the court concluded:

> The arbitration procedure specified by the agreement gives no unfair advantage to Eyring [physician]. Each side chooses an arbitrator, and the two arbitrators chosen appoint the third arbitrator. Eyring [physician] is bound by the arbitrators' decision, and any claim he has for payment of fees is subject to arbitration when a medical malpractice action is asserted. The patient is clearly informed by a provision in ten-point capital letter red type, directly above the signature line, that "by signing this contract you are giving up your right to a jury or court trial" on any medical malpractice claim. The agreements contain no buried terms. All terms are laid out clearly, including Article 2 of the agreements, which binds the spouse and heirs of the patient to the arbitration agreement.

***Id***. at 321.

¶32. While the circumstances surrounding the execution of the admission agreement in today's case demonstrate that the agreement is a contract of adhesion, these facts and circumstances do not support a finding of procedural unconscionability. The contract at issue was drafted unilaterally by the dominant party and then presented on a "take it or leave it" basis to the weaker party who had no real opportunity to bargain about its terms. As stated by the circuit judge, the evidence before the court established that "had Mr. Taylor not signed the admissions agreement, he would not have been accepted into the nursing home." However, this finding does not necessarily substantiate the general contractual defense of procedural unconscionability concerning the overall contract (admissions agreement) or the arbitration clause contained within the overall contract. To this end, procedural unconscionability must be substantiated by evidence of a lack of knowledge or voluntariness by the weaker party.

¶33. Here Stephens and Taylor together executed the admission agreements; that there were no circumstances of exigency; the arbitration agreement appeared on the last page of a six-page agreement and was easily identifiable as it followed a clearly marked heading printed in all caps and bold-faced type clearly indicating that section "F" was about "Arbitration;" the provision itself was printed in bold-faced type of equal size or greater than the print contained in the rest of the document; and, appearing between the arbitration clause and the signature lines was an all caps bold-faced consent paragraph drawing special attention to the parties' voluntary consent to the arbitration provision contained in the admissions agreement.[4] Under these facts,

---

[4]This "consent" or "acknowledgment" paragraph stated:

THE UNDERSIGNED ACKNOWLEDGE THAT EACH OF THEM HAS READ AND

it can not be said that there was either a lack of knowledge that the arbitration provision was an important part of the contract or a lack of voluntariness in that Stephens and Taylor somehow had no choice but to sign. Stephens and Taylor were two competent individuals signing a well-marked, highly visible agreement which indicated very clearly that dispute resolution would be accomplished by way of arbitration.

¶34. Additionally, there were two separately executed admissions agreements with arbitration clauses. Moreover, the second of the two agreements included extra language which was added by Vicksburg Partners to insure that its arbitration provision contained the requisite indicia of mutuality in the arbitration process. Thus, the execution of the amended (second) admissions agreement not only activated contractual language which insured that each party would bear equal responsibility in the unbiased selection of the arbitrator(s), but also provided another opportunity for Stephens and Taylor to review and reassess the admissions agreement. For all of these stated reasons, we find that the Nursing Home admissions agreement was not procedurally unconscionable.

### III. WHETHER THE ARBITRATION CLAUSE CONTAINED WITHIN THE ADMISSIONS AGREEMENT WAS SUBSTANTIVELY UNCONSCIONABLE.

¶35. When reviewing a contract for substantive unconscionability, we look within the four corners of an agreement in order to discover any abuses relating to the specific terms which

---

UNDERSTOOD THIS AGREEMENT, INCLUDING THE ARBITRATION PROVISION AND HAS RECEIVED A COPY OF THIS AGREEMENT, AND THAT EACH OF THEM VOLUNTARILY CONSENTS TO AND ACCEPTS ALL OF ITS TERMS AND PROVISIONS.

violate the expectations of, or cause gross disparity between, contracting parties. "Substantive unconscionability may be proven by showing the terms of the arbitration agreement [clause] to be oppressive." *East Ford,* 826 So. 2d at 714 (citing *York*, 585 F. Supp. 1278)). Substantive unconscionability is present when there is a one-sided agreement whereby one party is deprived of all the benefits of the agreement or left without a remedy for another party's nonperformance or breach. *Bank of Indiana v. Holyfield,* 476 F. Supp. 104, 110 (S.D. Miss. 1979) (citing *United States Leasing Corp. v. Franklin Plaza Apartments, Inc.*, 65 Misc.2d 1082, 319 N.Y.S.2d 531 (1971)).

¶36.    In *Buracynski*, the Tennessee Supreme Court recognized substantive unconscionability in the context of a contract of adhesion and noted that "[c]ourts will not enforce adhesion contracts which are oppressive to the weaker party or which serve to limit the obligations and liability of the stronger party." 919 S.W. 2d at 320 (citing *Broemmer v. Abortion Servs. of Phoenix, Ltd.*, 840 P.2d 1013, 1016 (Ariz. 1992)).   The Tennessee Supreme Court cited examples in support of its assertion:

> [I]n *Beynon v. Garden Grove Medical Group*, 100 Cal.App.3d 698, 161 Cal.Rptr. 146, 150 (1980), the court refused to enforce a provision in a group health insurance plan which gave the health care provider the unilateral right to reject an arbitrator's decision without cause and to require another arbitration before a panel of three physicians. The *Beynon* court noted that the insured was unaware of the provision and the provision was unduly oppressive because the insured was required to pay one-half the costs of both arbitrations. Finally, in *Broemmer*, the court refused to enforce an arbitration agreement which was contained in a clinic admission form and which required the arbitrators to be physicians specializing in obstetrics and gynecology. *Id.* at 1016.

919 S.W.2d at 320-21.

¶37. The arbitration clause in today's case is not oppressive. It provides Stephens with a fair process in which to pursue her claims. Moreover, it is typical of arbitration clauses endorsed by the FAA and is conscionable because it bears "some reasonable relationship to the risks and needs of the business." ***Burdette Gin,*** 726 So.2d at 1207 (quoting ***Bank of Indiana, Nat'l Ass'n v. Holyfield***, 476 F. Supp. 104, 109 (S.D. Miss. 1979).[5]

¶38. To invalidate the arbitration clause at bar in today's case would be to endorse a blanket policy of striking any arbitration clause contained within the body of a contract of adhesion. While unconscionably oppressive terms can be facially invalid, a per se finding of substantive unconscionability is strictly applicable only to a provision that by its very language significantly alters the legal rights of the parties involved and severely abridges the damages which they may obtain. In ***East Ford,*** we made a clear distinction between terms contained within contracts of adhesion which are invalid on their face and those which are not:

> While ***Burdette*** concluded that an indemnity clause within a contract of adhesion is presumptively unconscionable, the same is not true for arbitration clauses. ***Burdette*** involved an agreement to indemnify, which essentially allows a party to contract away or escape liability. Arbitration agreements merely submit the question of liability to another forum-generally speaking, they do not waive liability. Furthermore, Congress has expressed no federal interest in enforcing indemnification agreements as it has in guaranteeing the enforcement of valid arbitration agreements. *See* Federal Arbitration Act, 9 U.S.C. §§ 1 et seq.

826 So.2d at 716.

---

[5]Even though ***Burdette Gin*** involved a contract containing an indemnity clause, and not an arbitration clause, we have cited ***Burdette Gin*** in arbitration cases to guide us in determining whether the provision under attack was conscionable by applying the "reasonable relationship to the risks and needs of the business" test. ***East Ford***, 826 So.2d at 715.

23

¶39.   Without doubt, the arbitration provision contained in the body of the parties' admissions agreement is enforceable.   It merely provides for a mutually agreed-upon forum for the parties to litigate their claims and is benign in its effect on the parties' ability to pursue potential actions.

**IV.   WHETHER THE LIMITED LIABILITY AND PUNITIVE DAMAGES CLAUSES IN THE ADMISSIONS AGREEMENT ARE SUBSTANTIVELY UNCONSCIONABLE.**

We now turn our attention to the limitation of liability and punitive damages provisions to determine whether they, by their very language, are substantively unconscionable and therefore unenforceable.   Our concerns with the arbitration clause in the second admissions agreement is with language that, in its practical effect, creates a windfall for one party by curtailing another.   Specifically, such language can be found starting with the last sentence of that clause which states that "[c]onsistent with the terms and conditions of this Agreement, the Parties agree that the Arbitrator(s) may not award punitive damages and actual damages awarded, if any, shall be awarded pursuant to Paragraph E.7."[6]   Paragraph E.7 of the contract provides:

> Should any claim, dispute or controversy arise between the Parties or be asserted against any of the Facility's owner's (sic), officers, directors or employees, the settlement thereof shall be for actual damages not to exceed the lesser of a) $50,000 or b) the number of days the Resident was in the Facility multiplied times the daily rate applicable to said Resident. ***This limitation of***

---

[6]While the trial court did not specifically address the issue of limitation of liability/damages in its order, Stephens, through her trial counsel, clearly laid this issue out in her pleadings filed with the trial court.

*liability shall be binding on the Resident, Responsible Party and the Resident's heirs, estate and assigns*.[7]

(Emphasis added). However, we must also read Section F and paragraph E.7 in conjunction with paragraph E.8, which states that "[t]he parties hereto agree to waive punitive damages against each other and agree not to seek punitive damages under any circumstances." In reading this language, we find that Vicksburg Partners has effectively limited Stephens to recovery of actual damages not to exceed $50,000 while Vicksburg Partners is not so limited, and that they have precluded damages which could only be recovered against Vicksburg Partners.

¶40. As stated, the doctrine of substantive unconscionability invalidates oppressive terms which by their very nature render a contract oppressive, such as terms which violate the reasonable expectations of parties or which involve gross disparities in price. Thus, it is beneficial and appropriate to support an argument against a suspect term by demonstrating that the term was contained in a contract in which one party has minimal bargaining power – a contract of adhesion. *East Ford*, 826 So.2d at 716. Therefore, laying a foundation that a contract was one of adhesion makes an argument targeting a provision for a substantive unconscionability review easier to prove. As noted earlier, while a contract of adhesion does not demonstrate per se procedural unconscionability, it does provide a strong basis from which to attack the voluntary and knowledgeable formation of the entire contract. In much the same way, demonstrating a contract to be one of adhesion can make a facially oppressive term presumptively invalid.

---

[7]This last sentence concerning limitation of liability is not found in the first admissions agreement.

25

¶41.    In *East Ford*, we noted this effect and held that a contractual term which essentially allows a party to contract away or escape liability is presumptively unconscionable. *Id.* It follows that contractual terms which by their very nature greatly affect the legal rights of a party to litigate or recover appropriate damages, when not freely bargained for and openly discussed, must be stricken under the doctrine of unconscionability.    In *Burdette Gin*, we applied this very reasoning and concluded that an indemnification clause significantly altered the legal rights of the weaker party and rendered the parties' contract unconscionably oppressive.    Specifically, we held that "[s]ince it is possible that both the employer and the utility could be jointly liable in an accident such as the one at issue in this case, it is not reasonable to allow Entergy, with significantly greater bargaining power, to essentially unilaterally impose the indemnity clause upon its customers such as Burdette Gin." *Burdette Gin*, 726 So.2d at 1208.    In so holding, we determined that the clause at issue in *Burdette Gin* allowed Entergy to shield itself from liability by protecting it from its own potential negligence. *Id*.

¶42.    In our case today, the limitation of liability clause contained in section E.7 places a unilateral ceiling on Vicksburg Partners' potential liability.    To this end, they have issued a contract of adhesion containing a contractual provision which is one-sided on its face and unilaterally oppressive in its effect.    Moreover, in applying a substantive review to this provision, we can not help but take notice of the fact that Stephens's ability to fairly adjudicate her claim has been severely hamstrung and limited to a maximum recovery of $50,000, or less,

26

while Vicksburg Partners has access to an unlimited damage award. Clearly, this provision by its very nature evidences garden variety substantive unconscionability inasmuch as it is encapsulated in a contract of adhesion. Accordingly, the limitation on liability clause is unenforceable and is stricken from the parties' contractual agreement.

¶43. Additionally, while the waiver of punitive damages in paragraph E.8 applies to all parties to the contract, we find that based on the facts and circumstances of today's case, the practical effect of paragraph E.8 likewise causes it to be substantively unconscionable. While we can think of numerous factual scenarios which would justify Stephens seeking punitive damages against Vicksburg Partners, we are conversely for the most part unable to develop factual scenarios which would justify Vicksburg Partners seeking punitive damages against Stephens. In other words, Vicksburg Partners suffers little, if any, but gains a lot by waiving its rights to recover punitive damages, while the same is not true for Stephens. In consideration of the effect of the clause itself and the initial determination that today's contract is one of adhesion, we find that this waiver of punitive damages clause is also unenforceable.

¶44. In analyzing the effect of substantive oppression one treatise recognized that courts have the broad authority to discover substantive abuse in the form of harshness in a specific unreasonable provision which was included in an agreement without the employment of any procedural abuse in its formation. 8 Richard A. Lord, Williston on Contracts § 18:14, at 89 (4th ed. 1998). It likewise notes that "[s]uch a contractual provision may be invalidated on unconscionability grounds as a form of oppression reached under the Code's "principle...of the prevention of oppression." *Id*.

¶45.    This Court has readily recognized this remedial power of courts and has recognized a court's ability to invalidate provisions which are unconscionable and oppressive.   In *Norwest Financial Mississippi, Inc. v. McDonald*, 905 So.2d 1187, 1194 (Miss. 2005) we held that, "courts have the ability to restrict enforcement of specific terms of a contract that are viewed as unconscionable." To this end, courts have the ability to strike terms which render an otherwise valid contractual arrangement unconscionable.   In *Russell v. Performance Toyota, Inc.*, 826 So.2d 719, 724-25 (Miss. 2002), we noted this remedial authority provided to the courts of our state:

> Russell contends that the following two sentences within the arbitration agreement violate Miss.Code Ann. § 15-1-5 (1995): "[Arbitration] must be initiated within 180 days after the claim or controversy first arises. Failure to timely initiate arbitration shall constitute a waiver of the claim or controversy." Russell states that the sentences attempt to shorten the statute of limitations designated in § 15-1-5, and therefore the arbitration agreement is void. Mississippi case law, however, holds that if a court strikes a portion of an agreement as being void, the remainder of the contract is binding. *See, e.g., Lawler v. Government Employees Ins. Co.,* 569 So.2d 1151, 1153 (Miss.1990); *Plaza Amusement Co. v. Rothenberg,* 159 Miss. 800, 131 So. 350, 357 (1930) ("If an illegal condition is annexed to a contract, it will not void the whole contract, but the illegal part will be treated as void.") (citing *Adams v. Standard Oil Co.,* 97 Miss. 879, 53 So. 692 (1910)). Also, the Fifth Circuit has held that a limitation in an insurance policy was void under Mississippi law, but that the remainder of the policy was not affected by the void provision. *Richards v. Allstate Ins. Co.,* 693 F.2d 502, 505 (5th Cir.1982). Finally, the United States District Court for the Southern District of Mississippi, applying Mississippi law, specifically struck a time limitation period contained in a contract and declared that the remainder of the contract was binding. *Smith v. Orkin Exterminating Co.,* 791 F.Supp. 1137, 1142 (S.D.Miss.1990). We find that, even if the limitation time period contained in the arbitration agreement were void, the arbitration agreement is still binding.

*Performance Toyota*, 826 So.2d at 724-25.

¶46. Of particular note, the parties' contract recognizes this contractual "saving" device and explicitly acknowledges the preferred remedy of striking unenforceable provisions as opposed to the draconian remedy of striking the entire agreed upon and otherwise valid contractual arrangements. To this end, both admissions agreements contain an identical paragraph which states: "In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of this Agreement, which shall remain in full force and effect and enforceable in accordance with its terms." This language is delineated as paragraph E.1 under "Miscellaneous Provisions" in the first admissions agreement and as paragraph E.1 under "Other Important Provisions" in the second admissions agreement.

¶47. In today's case, we have referred to our prior decisions in *East Ford* and *Burdette Gin*, both which cited *Bank of Indiana* decided by the United States District Court for the Southern District of Mississippi. In *Bank of Indiana*, the district court stated:

> The law of Mississippi imposes an obligation of good faith and fundamental fairness in the performance of every contract governed thereby; in fact, this requirement is so pronounced that courts have the power to refuse to enforce any contract or limit the application of any clause therein in order to avoid an unconscionable result. Miss. Code Ann. § 75-2-302 (1972) states:
>
> > (1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

476 F. Supp. at 109. Thus, our action today in finding a portion of the arbitration clause to be unconscionable, but yet enforcing the remainder of the arbitration clause which we find to be conscionable and otherwise enforceable, is consistent with our case law, statute, and basic principles of contract law.

¶48.    We have considered our recent decision in *Pitts v. Watkins*, 905 So.2d 553 (Miss. 2005), and find that this case is clearly distinguishable.  In *Pitts*, we were confronted with a contract which, inter alia, (1) allowed one party to the contract to go to court to recover damages, while the other party was limited to arbitration, (2) attempted to shorten the statute of limitations, and (3) limited the amount of damages one of the parties could otherwise recover as a matter of law. *Id.* at 558. The language in the arbitration clause in today's case pales in comparison to the oppressive language contained in the arbitration clause in *Pitts*.

## CONCLUSION

¶49.    Today's case is clearly in line with our important holdings in *East Ford, Performance Toyota*, and *Burdette*.  We have hopefully today driven home a point for the benefit of the bench and the bar, as well as those individuals or entities who find themselves involved with contracts containing arbitration clauses.  Arbitration is about choice of forum – period.  With that having been said and in focusing on today's case, while this Court agrees that there could certainly be factual circumstances predicated on exigency and need for immediate health care, as evidenced in cases of hospital-patient admissions agreements, where the agreement at issue might require the patient to choose between forever waiving available remedies in a judicial

30

forum, or forgoing necessary medical treatment, this is not that case. We save for another day the resolution of a case with that factual scenario. The facts in today's case do not evidence an oppressive bargain, while albeit there does exist a contract of adhesion. Both the patient, as well as the person responsible for him, willingly, knowingly, and voluntarily agreed to have future disputes decided by a mutually selected arbitration panel. We have invalidated any limit on Vicksburg Partners' liability and removed language restricting punitive damages, and we find that the parties should undertake arbitration as agreed and avail themselves of the federally endorsed and substantively benign arbitration clause contained in the body of their contract.

¶50. For these reasons, we reverse the circuit court order denying Vicksburg Partners' motion to compel arbitration and remand this case to the Circuit Court of Warren County with directions to compel the parties to submit to arbitration consistent with this opinion.

¶51. **REVERSED AND REMANDED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY, DICKINSON AND RANDOLPH, JJ., CONCUR. GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**