# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CA-00924-SCT

*KENNETH CLEVELAND, M.D., AND CENTRAL*
*SURGICAL ASSOCIATES, PLLC*

*v.*

*JOHN MANN AND MARK MANN, HIS SONS,*
*BENEFICIARIES OF JOHN D. MANN, DECEASED*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/23/2005 |
| TRIAL JUDGE: | HON. TOMIE T. GREEN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | LORRAINE WALTERS BOYKIN |
| | WHITMAN B. JOHNSON |
| ATTORNEY FOR APPELLEES: | W. O. DILLARD |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | REVERSED AND REMANDED - 08/31/2006 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**DICKINSON, JUSTICE, FOR THE COURT**:

¶1.     This is an appeal of a trial court's order denying a motion to compel arbitration. For the reasons discussed herein, we reverse and remand for entry of an appropriate order consistent with this opinion, compelling arbitration.

## BACKGROUND FACTS AND PROCEEDINGS

¶2.     On September 17, 2002, John D. Mann underwent a total gastrectomy for stomach cancer. This surgery was performed by Dr. Kenneth Cleveland at Central Mississippi Medical Center ("CMMC"). Approximately nine months later, Mann again sought medical care from Dr. Cleveland for a hernia which developed in relation to Mann's gastrectomy.

¶3.    During this appointment, Mann was presented with a Clinic-Physician-Patient Arbitration Agreement.    The terms of the agreement are stated individually, with a space after each term for the patient to initial his understanding of that term.    The agreement must be signed by both the patient and an authorized representative for Central Surgical Associates ("CSA") and initialed by the doctor.    Mann signed the agreement on June 18, 2003, which was after his gastrectomy but prior to the surgery to repair his hernia.    The surgery to repair his hernia was scheduled for and performed on July 7, 2003, nineteen days after Mann signed the agreement.    The next day, Dr. Cleveland performed another surgery to repair Mann's bowel, which was punctured during the hernia repair.    Following this third surgery, complications developed which required Mann to have a CT scan.    This scan revealed Mann had liver cancer. On August 27, 2003, Mann died of metastic gastric cancer of the liver.[1]

¶4.    On April 16, 2004, John and Mark Mann ("plaintiffs"), wrongful death beneficiaries of Mann, brought a medical malpractice action against Dr. Cleveland, CSA, and CMMC.    The complaint alleged Dr. Cleveland was negligent in the care and treatment of Mann during the surgical procedure and post-operative care, which took place at CMMC.

¶5.    On May 19, 2004, Dr. Cleveland and CSA filed a Motion to Compel Arbitration and Stay Proceedings or Dismiss.    The basis for this motion was the arbitration agreement executed between Dr. Cleveland, CSA, and Mann prior to Mann's second surgery.    Dr.

---

[1] Plaintiffs state in their brief that they, along with CMMC, believe the cause of Mann's death was sepsis due to the infection caused when his bowel was punctured during the hernia repair. Plaintiffs argue this is contrary to the cause of death Dr. Cleveland put in his medical records, which was cancer. The conflict regarding the cause of Mann's death is not an issue for this Court to decide.

2

Cleveland and CSA argued plaintiffs were bound by this agreement, as the agreement stated it was binding on Mann's "heirs-at-law or personal representatives."

¶6.     In their Response to the Motion to Compel Arbitration, plaintiffs asserted that Mann did not enter into the agreement knowingly, voluntarily, and intelligently, and the agreement violated the Mississippi Arbitration Act.    The response further claimed that if the agreement was not void, it nevertheless did not bind plaintiffs, as they were beneficiaries under the wrongful death statute, rather than "heirs" because "they did not inherit the cause of action because it did not exist until his wrongful death."

¶7.     On February 24, 2005, Hinds County Circuit Court Judge Tomie T. Green issued a Memorandum Opinion and Order Denying Motion to Compel Arbitration.    Judge Green held that the agreement fell within the realm of adhesion and was unconscionable.   Dr. Cleveland and CSA filed a timely notice of appeal pursuant to ***Tupelo Auto Sales, Ltd. v. Scott***, 844 So. 2d 1167, 1170 (Miss. 2003) (holding an appeal may be taken from an order denying a motion to compel arbitration).  The issues on appeal are as follows:

I.      Whether the trial court erred in finding the arbitration agreement to be unenforceable.

II.     Whether the arbitration agreement is binding on Mann's wrongful death beneficiaries.

## STANDARD OF REVIEW

¶8.     This appeal stems from the denial of a motion to compel arbitration. This Court engages in de novo review of motions to dismiss and motions to compel. ***Vicksburg Partners, L.P. v. Stephens***, 911 So. 2d 507, 513 (Miss. 2005).   The Federal Arbitration Act provides that "arbitration agreements 'shall be valid, irrevocable, and enforceable, save upon such grounds

3

as exist at law or in equity for the revocation of any contract.'" *Norwest Fin. Miss., Inc. v. McDonald*, 905 So. 2d 1187, 1192 (Miss. 2005) (quoting 9 U.S.C. § 2). "Doubts as to the availability of arbitration must be resolved in favor of arbitration." *IP Timberlands Operating Co. v. Denmiss Corp.*, 726 So. 2d 96, 107 (Miss. 1998) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)). Further, this Court has held that "[a]rticles of agreement to arbitrate, and awards thereon are to be liberally construed so as to encourage the settlement of disputes and the presumption will be indulged in favor of the validity of arbitration proceedings." *Russell v. Performance Toyota, Inc.*, 826 So. 2d 719, 722 (Miss. 2002).

## DISCUSSION

I.      **Whether the trial court erred in finding the arbitration agreement to be unenforceable.**

¶9.     The Federal Arbitration Act provides a two-pronged inquiry for determining the validity of a motion to compel arbitration. *East Ford, Inc. v. Taylor*, 826 So. 2d 709, 713 (Miss. 2002). The first prong requires a threshold finding that the agreement to be arbitrated has a nexus to interstate commerce, followed by a finding that the terms of the arbitration agreement require the parties to arbitrate the kind of dispute involved in the litigation. *Id.* The second prong addresses whether legal constraints external to the agreement, such as fraud, duress, or unconscionability, foreclose arbitration of the claims. *Id.* (citing *Doctor's Assocs. v. Casarotto*, 517 U.S. 681, 686, 116 S. Ct. 1652, 134 L. Ed. 2d 902 (1996)).

4

*Interstate Commerce*

¶10.    In considering these two prongs, we turn to our decision in *Vicksburg Partners*, wherein this Court held, "[a] threshold determination which must be considered is whether the parties' . . . agreement falls within the provisions of § 2 of the Federal Arbitration Act."  911 So. 2d at 514.  Section 2 of the Federal Arbitration Act states:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

¶11.    The trial court stated the enforceability of an arbitration agreement between a medical provider and a patient was one of first impression for the court.    Plaintiffs assert this agreement regarding a medical procedure cannot be construed as affecting interstate commerce.[2]    However, Dr. Cleveland and CSA argue the medical treatment provided to Mann affects interstate commerce under *Vicksburg Partners*, where this Court held, "singular agreements between care facilities and care patients, when taken in the aggregate, affect interstate commerce."  911 So. 2d at 515.  While the *Vicksburg Partners* opinion was handed

---

[2] In determining the scope of transactions "involving commerce" under the Federal Arbitration Act, the United States Supreme Court has "concluded that the phrase 'involving commerce' is to be interpreted broadly and [is] the functional equivalent of the phrase 'affecting commerce,' which signals Congress' intent to exercise its Commerce Clause powers to the fullest extent." *Vicksburg Partners*, 911 So. 2d at 514-15 (citing *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273-74, 115 S. Ct. 834, 130 L. Ed. 2d 753 (1995)).  Interestingly, the agreement provides, "[a]ll parties agree that their relationship affects interstate commerce and that this Agreement shall be governed by the Federal Arbitration Act."

down subsequent to the trial court's ruling in this case, we have held that all judicial decisions apply retroactively unless the Court has specifically stated the ruling is prospective. *See **Miss. Transp. Comm'n v. Ronald Adams Contractor, Inc.***, 753 So. 2d 1077, 1093 (Miss. 2000); ***Morgan v. State***, 703 So. 2d 832, 839 (Miss. 1997). Therefore, following our opinion in ***Vicksburg Partners***, we conclude the economic activities of Dr. Cleveland and CSA affect interstate commerce, and the Federal Arbitration Act is applicable.

*Arbitrability of Dispute*

¶12.    Plaintiffs further argue this dispute is not within the scope of the agreement because it was executed subsequent to Mann's 2002 gastrectomy, and the 2003 hernia repair – the procedure for which the agreement was signed – was necessitated by the gastrectomy. Plaintiffs assert there was no agreement executed prior to the gastrectomy, so any injury arising therefrom is not subject to arbitration. Plaintiffs contend that if the agreement is found to be valid, this Court would be setting a "dangerous precedent," as it would "allow the appellant to get a signature nine months after the first surgery to remove the stomach and use it to defend against puncturing the intestines in the second operation."

¶13.    However, the agreement at issue states, "[p]atient agrees that in the event of any dispute, claim, or controversy arising out of *or relating to* the performance of medical services . . . such dispute or controversy shall be submitted to JAMS [3] . . . ." (Emphasis added). The theory of the plaintiffs' case is that the initial procedure led to the need for the hernia repair, and the

---

[3] "JAMS" stands for "Judicial Arbitration and Mediation Services," and it is a company which provides alternative dispute resolution services.

hernia repair was negligently performed, leading to this lawsuit. Thus, the procedures are related by plaintiffs' own theory of the case, and they are covered by the arbitration agreement.

*External Legal Constraints - Unconscionability*

¶14. The FAA's second prong of analysis requires us to consider whether legal constraints external to the parties' agreement foreclose arbitration of the claims. Plaintiffs assert this agreement was not signed by Mann knowingly, voluntarily and intelligently, and it is procedurally and substantively unconscionable. The trial court held "the agreement falls well within the realm of adhesion and unconscionability."

¶15. This Court has defined unconscionability as "'an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to the other party.'" *Taylor*, 826 So. 2d at 715 (quoting *Bank of Ind., Nat'l Ass'n v. Holyfield*, 476 F. Supp. 104, 109 (S.D. Miss. 1979)). We recognize two types of unconscionability-procedural and substantive:

> Procedural unconscionability may be proved by showing a lack of knowledge, lack of voluntariness, inconspicuous print, the use of complex legalistic language, disparity in sophistication or bargaining power of the parties and/ or a lack of opportunity to study the contract and inquire about the contract terms. Substantive unconscionability may be proven by showing the terms of the arbitration agreement to be oppressive.

*Taylor*, 826 So. 2d at 714 (citations omitted). "Procedural unconscionability looks beyond the substantive terms which specifically define a contract and focuses on the circumstances surrounding a contract's formation." *Vicksburg Partners*, 911 So. 2d at 517. In *Entergy Mississippi, Inc. v. Burdette Gin Co.*, 726 So. 2d 1202, 1207 (Miss. 1998), this Court divided

7

procedural unconscionability into two general categories: lack of knowledge and lack of voluntariness.

1.      Procedural Unconscionability-Lack of Knowledge

¶16.   "A lack of knowledge is demonstrated by a lack of understanding of the contract terms arising from inconspicuous print or the use of complex, legalistic language, disparity in sophistication of parties, and lack of opportunity to study the contract and inquire about contract terms." ***Vicksburg Partners***, 911 So. 2d at 517 (citations omitted).

¶17.   First, plaintiffs argue this agreement was procedurally unconscionable because of a disparity in the sophistication of the parties due to Mann's lack of education and inability to read or understand the agreement.   However, this Court has held the inability to read does not render a person incapable of possessing adequate knowledge of the arbitration agreement he or she signed.  *See* ***Equifirst Corp. v. Jackson***, 920 So. 2d 458, 464 (Miss. 2006).

¶18.   Plaintiffs also assert the agreement was not properly explained to Mann, as the terms would have been difficult for him to understand.   The agreement is a two-page document.   In a bold, capitalized font larger than that of the rest of the document, the first page of the document states:

> **NOTICE: BY SIGNING THIS CONTRACT YOU ARE AGREEING TO HAVE ANY CLAIM OF NEGLIGENCE OR MEDICAL MALPRACTICE DECIDED BY NEUTRAL BINDING ARBITRATION AND YOU ARE GIVING UP YOUR STATUTORY AND CONSTITUTIONAL RIGHT TO A JURY OR COURT TRIAL.**

This first page is signed and dated by J. Loftin, as an authorized representative of CSA, signed by Mann, and initialed by Dr. Cleveland.

8

¶19. The second page of the agreement contains an explanation of each term found on the first page of the agreement. The top of this page states the patient is to initial next to each term after a member of the medical staff has explained that term to the patient. Mann's initials appear next to each term. The bottom of the second page states, "I hereby confirm that I have explained the arbitration agreement to the Patient and the Patient has affirmed his or her understanding of that agreement by initialing or signing beside each of the foregoing provisions." This statement is signed by Jennifer Loftin, an authorized representative for CSA, and is initialed by Dr. Cleveland.

¶20. In her affidavit, Barbara Templeton, Mann's sister-in-law, stated she accompanied Mann to his appointment on June 18, 2003. She said Mann was handed a document and told by the receptionist to sign it and to ask Dr. Cleveland any questions he may have. She stated she went to the restroom for three to five minutes, and when she returned, Mann was ready to leave. Templeton testified that on the way home, Mann told her he asked Dr. Cleveland what the agreement meant, and Dr. Cleveland replied, "It's so you won't sue me."

¶21. In his affidavit, Dr. Cleveland disputes these claims and maintains that Mann signed the agreement and initialed his understanding on the second page of the agreement before meeting with him. Dr. Cleveland stated that when he met with Mann, he asked Mann if he signed the agreement and understood it, and then he answered Mann's questions regarding the agreement. Dr. Cleveland asserted in his affidavit that Mann's signature and his initials "signified that he had read the contract, had its terms explained to him, fully understood its terms, and consented to the surgery." Dr. Cleveland explained that his initials at the bottom of both pages of the

9

agreement "confirmed that all of [Mann's] questions regarding the arbitration agreement had been answered."

¶22. This Court has not been furnished with an affidavit or any testimony from Jennifer Loftin, the authorized representative from CSA who signed the agreement stating she explained its terms to Mann. Plaintiffs argue that it "appears these may not be Mann's initials" on the second page, and that *J.* Loftin who signed on the first page is not the same as *Jennifer* Loftin who signed on the second page. This contention was not asserted at the trial level. Additionally, plaintiffs offer no evidence to support this contention and cite no legal authority for this argument in their brief. Therefore, this argument merits no consideration by this Court. *See* **Ferrell v. River City Roofing, Inc.**, 912 So. 2d 448, 456 (Miss. 2005) (failure to cite relevant authority obviates Court's obligation to review issue); **Tate v. State**, 912 So. 2d 919, 928 (Miss. 2005) (appellate court will not review issues raised for the first time on appeal).

¶23. The language in this agreement is neither complex nor convoluted. The language stating Mann was giving up his right to a trial is boldly printed in all capital letters in a font larger than the font in the rest of the agreement. The second page of the agreement fully states and explains the individual terms of the agreement. Plaintiffs' claim that Mann could not have understood the agreement is without merit, as this Court has held, "[a] person cannot avoid a written contract which he has entered into on the ground that he did not read it or have it read to him . . . ." **Cont'l Jewelry Co. v. Joseph**, 140 Miss. 582, 585, 105 So. 639 (1925). Further, Mann signed the first page of the agreement and initialed beside each term on the second page, denoting his understanding of the terms. Mann's initials on the second page of the agreement also indicate he was provided an opportunity to inquire about the agreement's terms. Plaintiffs

may not escape the agreement by simply stating Mann did not read the agreement or have it read to him or understand its terms.

¶24. Plaintiffs further claim the agreement was procedurally unconscionable because Mann did not have the opportunity to study the contract. They assert Mann was not provided with a copy of the contract to take home, and the original agreement was not furnished to the trial court. However, plaintiffs did not present these arguments to the trial court, and they have not provided any evidence or legal authority for support. Therefore, this Court is not obligated to consider the issue of whether Mann was furnished with a copy of the agreement. *See Ferrell*, 912 So. 2d at 456; *Tate*, 912 So. 2d at 928.

### 2. Procedural Unconscionability-Lack of Voluntariness

¶25. A contract of adhesion is an agreement "drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it' basis to the weaker party who has no real opportunity to bargain about its terms." *Taylor*, 826 So. 2d at 716 (citations omitted). Such contracts are usually pre-printed and contain provisions in extremely small print. *Id.*

> A lack of voluntariness is demonstrated in contracts of adhesion when there is a great imbalance in the parties' relative bargaining power, the stronger party's terms are unnegotiable, and the weaker party is prevented by market factors, timing or other pressures from being able to contract with another party on more favorable terms or to refrain from contracting at all.

*Id.* at 716 (citations omitted).

¶26. This agreement was prepared for Dr. Cleveland and CSA by the Phelps Dunbar, LLP, law firm. The agreement appears on a printed form but does not contain any small print. However, the parties dispute whether the agreement was presented on a "take it or leave it" basis. Plaintiffs assert Mann was in a great deal of pain during the June 18 visit to Dr. Cleveland's

office. Templeton also stated in her affidavit that during the visit, Mann was in pain and under stress because of the hernia. On the other hand, Dr. Cleveland stated Mann was not under a heavy burden of pain or stress at the time of signing.

¶27. The claim of a lack of voluntariness fails for several reasons. First, Mann initialed on the second page of the agreement next to the term stating, "[p]atient is not in need of emergency care or under immediate stress." Second, the agreement provides for rescission within fifteen days of signing the agreement, and Mann had nineteen days before his surgery. Additionally, the agreement states, "[b]efore signing the Agreement the Patient may make written changes in the Arbitration Agreement if they so desire and present these to the Clinic for approval." While the trial court held it did not seem reasonable or practical for Mann to have secured legal advice in light of his pressing medical condition, Mann's surgery was not scheduled until nineteen days after he executed the agreement, so Mann did not have "to choose between forever waiving available remedies in a judicial forum, or forgoing necessary medical treatment . . . ." *Vicksburg Partners*, 911 So. 2d at 525. For all of these reasons, we conclude the agreement was not procedurally unconscionable.

      3.     Substantive Unconscionability

¶28. Plaintiffs argue the agreement was substantively unconscionable due to Dr. Cleveland's and CSA's right to choose the arbitration association and the patient's right to appeal only in limited circumstances. At the trial level, plaintiffs did not assert as substantively unconscionable the patient's limited right to appeal. They also failed to provide any argument or legal authority to support this assertion in their brief to this Court. Therefore, this Court

12

is under no duty to consider this argument. *See Ferrell*, 912 So. 2d at 456; *Tate*, 912 So. 2d at 928.

¶29.    Notwithstanding the procedural bar, this claim further fails on its merits. "Substantive unconscionability may be found when the terms of the contract are of such an oppressive character as to be unconscionable." *Russell*, 826 So. 2d at 725. This Court has held, "[s]ubstantive unconscionability is present when there is a one-sided agreement whereby one party is deprived of all the benefits of the agreement or left without a remedy for another party's nonperformance or breach." *Vicksburg Partners*, 911 So. 2d at 521.

¶30.    The portion of the agreement regarding CSA's choice of an arbitration association states, "[a]rbitration will be performed by JAMS. This is a national association of neutral arbitrators. They don't work for Physician or for the Patient. The Clinic will pay the costs, except for the first $125.00, and each side will pay for their own attorneys and other costs." Mann initialed next to the explanation of this term of the agreement. However, plaintiffs argue Mann could not have known what JAMS was, and it was unconscionable that Dr. Cleveland and CSA chose the arbitration association who would hear the dispute.

¶31.    In *Vicksburg Partners*, this Court looked to examples cited by the Tennessee Supreme Court of "oppressive" arbitration agreements. In *Buraczynski v. Eyring*, 919 S.W.2d 314, 320-21 (Tenn. 1996), the Tennessee Supreme Court cited *Beynon v. Garden Grove Medical Group*, 161 Cal. Rptr. 146, 150 (Cal. Ct. App. 4th Dist. 1980), in which the court found an agreement oppressive where a health care provider required arbitration take place before a panel of three physicians. *Vicksburg Partners*, 911 So. 2d at 521. The Tennessee Court

13

further cited ***Broemmer v. Abortion Services of Phoenix, Ltd.***, 840 P.2d 1013, 1016 (Ariz. 1992), in which the Arizona Supreme Court held unconscionable an agreement drafted by an abortion services clinic in which arbitration had to take place in front of physicians specializing in obstetrics and gynecology. ***Vicksburg Partners***, 911 So. 2d at 521.

¶32. This Court has held, "[w]hile unconscionably oppressive terms can be facially invalid, a per se finding of substantive unconscionability is strictly applicable only to a provision that by its very language significantly alters the legal rights of the parties involved and severely abridges the damages which they may obtain." ***Id.*** The agreement at issue provides Mann with a fair opportunity and a proper forum in which to dispute his claims. It does not limit Mann's damages, Mann's legal rights, or Dr. Cleveland's and CSA's liability. The agreement further provides for arbitration by a neutral association in the business of providing neutral arbitrators. For these reasons, we conclude the agreement at issue is not substantively unconscionable.

¶33. We find the agreement is neither procedurally nor substantively unconscionable. Therefore, the trial court erred in denying the Motion to Compel Arbitration.

> **II.     Whether the arbitration agreement is binding on Mann's wrongful death beneficiaries**.

¶34. Plaintiffs assert the agreement is not binding on their claim, as it was not signed by them or by anyone with authority to sign on their behalf. However, the agreement expressly states it applies to "any dispute . . . between Patient (whether a minor or an adult) or the heirs-at-law or personal representative of Patient, as the case may be, and the Clinic, PLLC and each Physician individually . . . ."

14

¶35.    In *Terminix International, Inc. v. Rice*, 904 So. 2d 1051, 1058 (Miss. 2004), this Court adopted the Fifth Circuit's holding in *Washington Mutual Finance Group, LLC v. Bailey*, 364 F.3d 260, 266 (5th Cir. 2004), that the plaintiff was bound by an arbitration agreement signed by her husband, although not by her. "'It does not follow . . . that under the [Federal Arbitration] Act an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision. [We have made] clear that a nonsignatory party may be bound to an arbitration agreement if so dictated by the ordinary principles of contract and agency.'" *Terminix*, 904 So. 2d at 1058 (quoting *Washington Mutual*, 364 F.3d at 266).

¶36.    Further, this Court held in *Smith Barney, Inc. v. Henry*, 775 So. 2d 722, 726 (Miss. 2001), "[t]he death of a party to an agreement to arbitrate future disputes does not invalidate the agreement." The agreement in *Smith Barney* plainly stated it was binding on heirs, successors, and administrators, as does the agreement at issue. *Id.* at 727. This Court upheld the agreement in *Smith Barney*, concluding, "[a]ccording to the terms of the agreement, [plaintiff] is not required to be a signatory in order to be bound by the arbitration clause. As a successor of [the deceased], [plaintiff] is covered by the arbitration clause of the client agreements." *Id.* at 727.

¶37.    The dissent takes a contrary view, which it rests upon several false premises. First, the dissent says a wrongful death action belongs solely to the heirs of the deceased. This premise, of course, is completely contrary to the express language of our wrongful death statute, which provides that, in a wrongful death suit, the plaintiff must pursue "all the damages of every kind to the decedent and all damages to every kind to any and all parties interested in the suit."

15

Miss. Code Ann. § 11-7-13 (Rev. 2004). The parties "interested in the suit" are not limited to the wrongful death beneficiaries, but could include the estate of the decedent, an insurance company exercising its right of subrogation, and any other parties claiming a right of recovery.

¶38. The dissent is also incorrect in stating that wrongful death is different from other torts because it cannot arise until after death. Wrongful death is not a tort, but rather a cause of action based upon an underlying tort that must have been committed against the decedent, resulting in the decedent's death. *Id.*

¶39. Finally, and perhaps most significantly, the dissent misunderstands what is required under Section 11-7-13 to justify a wrongful death claim. Under the statute, a wrongful death claim is one the decedent must have been able to bring had death not ensued. The statute opens with the following mandate:

> Whenever the death of any person . . . shall be caused by any real, wrongful or negligent act or omission, . . . as would, *if death had not ensued, have entitled the party injured or damaged thereby to maintain an action* and recover damages in respect thereof, . . . the person . . . that *would have been liable if death had not ensued*, . . . shall be liable for damages . . . .

Miss. Code Ann. § 11-7-13.

¶40. Based on the clear language of the statute, a wrongful death beneficiary is only allowed to bring claims that the decedent could have brought if the decedent had survived. Since the beneficiaries may only bring claims the decedent could have brought had the decedent survived, logic requires us to conclude that the converse is true, that is, the decedents may NOT bring claims the decedent could not have brought, had the decedent survived. Thus, plaintiffs in this case may not bring claims Mann could not have brought himself. This same reasoning was applied unanimously by this Court in *Jenkins v. Pensacola Health Trust*, No. 2005-IA-02342-

16

SCT, 2006 Miss. LEXIS 208, at *8 (Miss. Apr. 27, 2006), where we held that the beneficiaries could not bring a claim for wrongful death where the statute of limitations had expired and would have prevented the decedent from bringing the claim herself. *Id*.

¶41. Because Mann agreed to arbitrate, he could not have brought this claim for medical malpractice even if death had not ensued. He would have been required to submit his claim to arbitration. Therefore, since Mann could not have brought this claim, neither can plaintiffs.

¶42. Although the dissent skillfully attempts to support its view by citing cases from other jurisdictions, we are not troubled by the authorities cited. While it is true that a few jurisdictions take a contrary view, our holding today fully comports with Mississippi law and the law of many other jurisdictions. See *Briarcliff Nursing Home, Inc. v. Turcotte*, 894 So. 2d 661, 664 (Ala. 2004) (Alabama Supreme Court held that a wrongful death action was covered by the decedent's agreement to arbitrate); *Herbert v. Superior Court*, 169 Cal. App. 3d 718, 727 (Cal. App. 2d Dist. 1985) (wrongful death suit by non-signatories of the arbitration agreement was covered by the agreement); *Allen v. Pacheco*, 71 P.3d 375, 379 (Colo. 2003) (Colorado Supreme Court held that an arbitration agreement applied to wrongful death claims). We are presented with no compelling reason to discard our own precedent and adopt the reasoning advanced by a handful of foreign courts of appeals.

¶43. In its opinion and order, the trial court held that in light of this Court's decision in *Smith Barney*, plaintiffs were bound by the agreement. We agree with this holding of the trial court.

## CONCLUSION

¶44. As to Issue I, we find the agreement is valid under the two prong test enumerated by this Court in *Taylor*. The agreement unambiguously provides that the method of dispute resolution is arbitration, and the terms of the agreement are fair and do not impermissibly limit the rights of the patient. Therefore, we hold the trial court erred in denying the Motion to Compel Arbitration.

¶45. As to Issue II, this Court made clear in its holdings in *Terminix* and *Smith Barney* that heirs-at-law may be bound by arbitration agreements to which they were not signatories. Therefore, the trial court did not err in holding that plaintiffs are bound by the agreement executed by Mann.

¶46. For these reasons, we reverse the trial court's judgment denying the motion to compel arbitration, and we remand this case to the trial court with instructions that it enter an appropriate order, consistent with this opinion, compelling the parties to submit their dispute to arbitration.

¶47. **REVERSED AND REMANDED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., AND CARLSON, J., CONCUR. DIAZ, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY EASLEY AND GRAVES, JJ.; RANDOLPH, J., JOINS IN PART.**

**DIAZ, JUSTICE, DISSENTING:**

18

¶48. With respect to my colleagues in the majority, I am compelled to dissent. The majority defies logic and the basic principles of contract law by holding that parties to a contract can bind the cause of action belonging to a third party—a cause of action that does not yet exist and which does not arise from the contract. A creature of statute, the wrongful death action belongs solely to the heirs of the deceased and those who might stand in place of the decedent.

## I. Wrongful Death.

¶49. The majority finds that the arbitration agreement is binding on the heirs of John D. Mann. For this proposition, they only cite two cases, neither of which involve wrongful death. The case of **Smith Barney, Inc. v. Henry** is relied upon heavily; however, that case involved a lawsuit for the breach of fiduciary duty, negligence, and conspiracy, *not* wrongful death. 775 So. 2d 722, 724 (Miss. 2001).

¶50. Also cited for support is **Terminix Intern., Inc. v. Rice**, where a plaintiff made the argument that she was not bound by an arbitration agreement signed by her husband; this case also did not involve wrongful death. 904 So.2d 1051, 1057-58 (Miss. 2004).

¶51. The analysis in the majority opinion simply does not address the most important facet of wrongful death: wrongful death is different from other torts because it cannot arise until *after* death. "Wrongful death is a *separate and distinct* cause of action, which can be brought *only* by the survivors of the deceased." **Gentry v. Wallace**, 606 So.2d 1117, 1119 (Miss. 1992) (emphasis added), *overruled on other grounds by* **Jenkins v. Pensacola Health Trust, Inc.**, __ So. 2d __, 2006 WL 1098895, *2 (Miss. Apr. 27, 2006). For "while a personal injury case enables an injured party to recover damages for the injuries he has sustained, a wrongful death action is intended to compensate the heirs of the deceased for losses stemming from the

19

death of the injured party." *Id*. at 1120. *See also* **In re Estate of England**, 846 So.2d 1060, 1066 (Miss. Ct. App. 2003).[4]

¶52. This clear precedent establishes logically that since a wrongful death action cannot arise until *after* the death of a party to an arbitration agreement, the heirs cannot be bound by an arbitration agreement, which by its nature is only binding for actions that could have been brought by the decedent. If we decide here today that wrongful death actions, which arise after the death of the party to arbitration, are covered by that agreement, what is *not* covered by this arbitration agreement? *See* **Smith v. Steinkamp**, 318 F.3d 775, 777 (7th Cir. 2003).

¶53. Other courts have also determined that wrongful death actions are separate and distinct causes of action, and have refused to require arbitration by virtue of the common law or state statute. *See* **Goliger v. AMS Props., Inc.**, 123 Cal. App. 4th 374, 377 (Cal.Ct. App. 2 Dist. 2004) (arbitration agreement did not bind daughter even when she signed as "responsible party," as she was not signing away her personal right to a wrongful death action); **Dream Maker Constr., Inc. v. Murrell**, 603 S.E.2d 72, 72-73 (Ga. Ct. App. 2004) ("the Georgia Arbitration Code was never intended by the General Assembly to encompass personal injury or wrongful death actions . . . because the Act expressly excluded such subject matter from coverage," examining O.C.G.A. § 9-9-2 (c)(10), which prohibits "[a]ny agreement to arbitrate future claims arising out of personal bodily injury or wrongful death based on tort"); **Finney v. Nat'l Healthcare Corp.**, 193 S.W.3d 393, 397 (Mo. Ct. App. 2006) (refusing to compel

---

[4]In some states, wrongful death is a "deivative" action pursuant to staute. *See* **Ballard v. Southwest Detroit Hosp**., 327 N.W.2d 370, 371 (Mich. Ct. App. 1982). That is not the case in our state.

daughter to arbitrate wrongful death claim in nursing home case); ***Campbell v. Callow***, 876 S.W.2d 25, 26 (Mo. Ct. App. 1994) ("A wrongful death claim does not belong to the deceased . . . . The right of action is neither a transmitted right nor a survival right, but is created and vested in the survivors at the moment of death"); ***In re Kepka***, 178 S.W.3d 279, 294-95 (Tex. App.-Houston 2005) (representative's wrongful death action not bound by arbitration).

## II. Standard of Review.

¶54. An agreement to waive one's right to a jury trial impacts multiple portions of the Mississippi Constitution. The Bill of Rights of our state constitution guarantees that "[a]ll courts shall be open; and every person for an injury done him in his lands, goods, person, or reputation, *shall have* remedy by due course of law, and right and justice shall be administered without sale, denial, or delay." Miss. Const. of 1890, art. 3, § 24 (emphasis added).

¶55. Further, "[n]o person *shall be debarred* from prosecuting or defending any civil cause for or against him or herself, before any tribunal in the state, by him or herself, or counsel, or both." Miss. Const. of 1890, art. 3, § 25 (emphasis added). In all these matters, "[t]he right of trial by jury *shall remain inviolate* . . . ." Miss. Const. of 1890, art. 3, § 31 (emphasis added).[5]

¶56. The repetition of the word "shall" in our Constitution demonstrates that these rights were to remain inviolate under any circumstances. However, these critical facets of our state constitution are all supposedly abridged by the simple act of signing a contract. The judicial power of the state of Mississippi is vested in this Court by that same Constitution, and it is

---

[5]The waiver of a trial by jury via arbitration also collides with other portions of the Constitution of 1890, namely Sections 13 ("in all prosecutions for libel the truth may be given in evidence, and the jury shall determine the law and the facts under the direction of the court . . . ") and 14 ("No person shall be deprived of life, liberty, or property except by due process of law").

21

accordingly our duty as a court to safeguard the constitutional rights of the citizens of Mississippi. Miss. Const. of 1890, art. 6, §§ 144, 146.

¶57.     In deference to the rights of the citizens of Mississippi and the language in our state constitution, I believe that any arbitration agreement, which by its nature purports to abridge constitutional rights, should be reviewed with a high level of scrutiny. Additionally, the circumstances surrounding the decision of the parties to enter into the arbitration agreement should also be examined when determining the validity of the arbitration agreement. These safeguards are needed because arbitration is not simply a choice of forum; it intimately affects a citizen's constitutional rights.

¶58.     As the learned trial judge noted, "[t]he average patient is usually not as familiar with arbitration . . . as may be the medical provider . . . who urges him to sign away his rights." Out of concerns for the lack of bargaining power the patient might have, and of the fact that the agreement may be one-sided, the trial court "use[d] caution in its scrutiny of . . . arbitration agreements, especially since the agreement is offered to the patient as a prerequisite to necessary medical treatment." This "cautious" approach is warranted by the significance of the legal rights at stake.

¶59.     The right to a jury of one's peers and the right of access to the court system of the state of Mississippi is a fundamental right with which arbitration significantly interferes, and it should be reviewed accordingly. *See* ***Miss. Comm'n on Judicial Performance v. Wilkerson***, 876 So.2d 1006, 1011 (Miss. 2004) (restrictions on First Amendment-guaranteed speech are reviewed with strict scrutiny); ***Associated Press v. Bost***, 656 So.2d 113, 117 (Miss. 1995) ("Strict scrutiny review has also been applied when a statute infringes upon a

fundamental right"); *Doe v. Doe*, 644 So.2d 1199, 1210 (Miss. 1994) (parents' right to raise children is fundamental and any deprivation is reviewed with strict scrutiny); *Miss. H.S. Activities Ass'n, Inc. v. Coleman ex rel. Laymon*, 631 So.2d 768, 774 (Miss. 1994) (noting that the right to travel is fundamental and restrictions are reviewed with strict scrutiny). Arbitration continues to pose a threat to the constitutional rights of the citizens of Mississippi and must be scrutinized accordingly. I would apply a strict scrutiny standard in reviewing all arbitration agreements, regardless of whether the issues were raised at the trial court or by the parties.

¶60.    For the foregoing reasons, I respectfully dissent.

**EASLEY AND GRAVES, JJ., JOIN THIS OPINION.  RANDOLPH, J., JOINS THIS OPINION IN PART.**

23