# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2024-CA-00488-SCT

*MANHATTAN NURSING AND
REHABILITATION CENTER, LLC, ASHLEY
BOULDIN, LPN, AND FREDIA HARVEY, LPN*

*v.*

*VERNA HAWKINS, INDIVIDUALLY, AND ON
BEHALF OF AND FOR THE USE AND BENEFIT
OF THE WRONGFUL DEATH BENEFICIARIES
OF WYDETT HAWKINS*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/05/2024 |
| TRIAL JUDGE: | HON. ADRIENNE ANNETT HOOPER-WOOTEN |
| TRIAL COURT ATTORNEYS: | COURTNEY McREYNOLDS WILLIAMS |
| | RICHARD PAUL WILLIAMS, III |
| | GEORGE CLANTON GUNN, IV |
| | W. DAVIS FRYE |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANTS: | W. DAVIS FRYE |
| | GEORGE CLANTON GUNN, IV |
| | HAYLEY RENEE OLDHAM |
| ATTORNEYS FOR APPELLEE: | RICHARD PAUL WILLIAMS, III |
| | DARYL MATTHEW NEWMAN |
| | COURTNEY McREYNOLDS WILLIAMS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 02/19/2026 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**SULLIVAN, JUSTICE, FOR THE COURT:**

¶1.     This case determines whether a wife had the authority to bind her husband to an

arbitration agreement contained within admissions paperwork she signed while admitting him

to a long-term-healthcare facility. We find that admission to the facility was not contingent on execution of the arbitration agreement, thus it was not a healthcare decision. The wife did not have the authority to enter into such an arbitration agreement, making the arbitration agreement unenforceable. Therefore, we affirm the judgment of the trial court denying the motion to compel arbitration and to stay proceedings.

## FACTS

¶2. On November 17, 2021, Wydett Hawkins was admitted to Manhattan Nursing and Rehabilitation Center, LLC, a long-term-healthcare facility in Jackson. Wydett's wife, Verna Hawkins, signed all admission paperwork. One of the documents that Verna signed was an arbitration agreement.

¶3. Under the arbitration agreement, "all claims, disputes, and controversies of any kind between the parties arising out of or relating in any way to the [a]dmission [a]greement or any service or health care provided by [Manhattan] to the [r]esident shall be resolved exclusively by binding arbitration." The arbitration agreement bound Wydett and

> all persons whose claim arises from or relates to any service or health care provided by [Manhattan] to [r]esident or [r]esident's stay at [Manhattan], including, but not limited to, [r]esident's parents, spouse, children, grandchildren, guardian, executor, executrix, administrator, administratrix, personal representative, successor, assigns, agents, attorneys, third party beneficiaries, insurers, trustees, next friends, legal representatives, and heirs.

It is undisputed that execution of the arbitration agreement "[wa]s not a condition of admission to, or requirement to continue to receive care at, [Manhattan]."

¶4. Wydett was transferred to St. Dominic Hospital on February 10, 2022, due to a

2

decreased level of consciousness. Wydett died on February 21, 2022, at Hospice Ministries due to Alzheimer's-type dementia.

¶5. Verna, individually and on behalf of Wydett's wrongful-death beneficiaries, filed suit against Manhattan and two of Manhattan's nurses, Ashley Bouldin and Fredia Harvey, and alleged that Wydett "suffered over-sedation, dehydration, medical conditions, chemical restraint, abuse and neglect, unexplained injuries, and an unkept appearance, suffered disfigurement, poor hygiene, mental decline, . . . other injuries, and ultimately death as a result of the improper care and treatment provided to him by . . . Manhattan . . . and/or its staff or other personnel[.]" In response, Manhattan, Bouldin, and Harvey[1] filed a motion to compel arbitration and to stay proceedings.

¶6. In its motion, Manhattan argued that there was a valid and enforceable arbitration agreement between the parties, that the parties' dispute was within the scope of the arbitration agreement, and that there were no legal constraints external to the parties' agreement that foreclosed arbitration of the alleged claims. According to Manhattan, Dr. Timothy Estes was Wydett's primary physician, and Dr. Estes determined at the time of admission that Wydett lacked capacity. Manhattan argued that due to Wydett's lack of capacity, Verna had the authority to make healthcare decisions on Wydett's behalf as Wydett's healthcare surrogate. Manhattan also argued that Verna's execution of the arbitration agreement constituted a healthcare decision under the Uniform Health-Care

---

[1]We refer to Manhattan, Bouldin, and Harvey collectively as "Manhattan."

Decisions Act.

¶7.    Verna, however, argued that she did not have authority as Wydett's healthcare surrogate because "[Wydett] had not been determined by his primary physician to lack capacity prior to his admission to [Manhattan]." Verna claimed that despite Manhattan's assertions, Dr. Estes "was not [Wydett's] primary physician prior to his admission to Manhattan" and that "Dr. Estes did not first evaluate [Wydett] until . . . nine days after [Wydett's] admission to [Manhattan]."

¶8.    Verna further argued that even if she had authority as Wydett's healthcare surrogate, her execution of the arbitration agreement was not a healthcare decision because execution of the arbitration agreement "was not a condition of admission to, or requirement to continue to receive care at, [Manhattan]." According to Verna, because the execution of the arbitration agreement was not a healthcare decision, she "did not have legal authority to bind [Wydett] to arbitration."

¶9.    After a hearing, the trial court denied Manhattan's motion to compel arbitration and to stay proceedings. The trial court noted that "[p]ursuant to the Uniform Health-Care Decisions Act[,] 'the authority of a health-care surrogate is limited to making health-care decisions,'" (citing *Miss. Care Ctr. of Greenville, LLC v. Hinyub*, 975 So. 2d 211, 218 (Miss. 2008)). Relying on *Hinyub*, the trial court found that Verna's execution of the arbitration agreement was not a healthcare decision because execution of the arbitration agreement was not "an essential part of the consideration for the receipt of 'healthcare.'"

4

(citing *Hinyub*, 975 So. 2d at 218). The trial court explained:

> Ultimately, where arbitration is not an essential part of the consideration for the receipt of health-care, agreements to arbitrate are not "health-care" decisions to be made by a "surrogate." In the instant case, the arbitration provision at issue explicitly states that "execution of this Agreement is not a condition of admission to, or requirement to continue to receive care at, the facility." Pursuant to clear Mississippi law, execution of the arbitration provision in the instant case was not a healthcare decision.

¶10. The trial court concluded that "the arbitration agreement at issue [wa]s unenforceable." Notably, the trial court did not address whether Verna qualified or had authority to act as a healthcare surrogate.

¶11. Manhattan timely appealed. On appeal, Manhattan asserts (1) the execution of an arbitration agreement is a healthcare decision under the Uniform Health-Care Decisions Act,[2] and (2) the trial court erred by refusing to enforce the properly executed arbitration agreement.

## STANDARD OF REVIEW

¶12. "This Court employs a de novo standard when reviewing a trial court's denial of a motion to compel arbitration." *Belhaven Senior Care, LLC v. Smith*, 359 So. 3d 612, 616 (Miss. 2023) (citing *Adams Cmty. Care Ctr., LLC v. Reed*, 37 So. 3d 1155, 1158 (Miss. 2010)). "The burden of establishing the existence of an arbitration agreement, in line with the burden of establishing the existence of a contract, rests on the party seeking to invoke it."

---

[2]Mississippi Health Care Association filed an *amicus curiae* brief in support of Manhattan. Like Manhattan, the Association asserts that the execution of an arbitration agreement is a healthcare decision under the Uniform Health-Care Decisions Act.

*Wellness, Inc. v. Pearl River Cnty. Hosp.*, 178 So. 3d 1287, 1292 (Miss. 2015) (citing

*Trinity Mission Health & Rehab of Holly Springs, LLC v. Lawrence*, 19 So. 3d 647, 651-52

(Miss. 2009)). Additionally, "[t]his Court employs a 'strict interpretation' of the Health-Care

Decisions Act." *Smith*, 359 So. 3d at 618 (quoting *Tarvin v. CLC of Jackson, LLC*, 193 So.

3d 633, 637 (Miss. 2016)).

**DISCUSSION**

¶13.    This Court has held that

> In determining the validity of a motion to compel arbitration under the Federal
> Arbitration Act, courts generally conduct a two-pronged inquiry. The first
> prong has two considerations:  (1) whether there is a valid arbitration
> agreement and (2) whether the parties' dispute is within the scope of the
> arbitration agreement.

*E. Ford, Inc. v. Taylor*, 826 So. 2d 709, 713 (Miss. 2002). Thus, the first step in this Court's

inquiry is to determine whether the parties agreed to arbitration. In order to bind her husband

to the agreement, Verna needed the authority to do so. Because Wydett did not have a power

of attorney, a healthcare directive, a guardianship, or a conservatorship, the only alleged

authority Verna had to execute the documents on his behalf was as a healthcare surrogate.

¶14.    According to Mississippi Code Section 41-41-211(1),

> [a] surrogate may make a *health-care decision* for a patient who is an adult or
> emancipated minor if the patient has *been determined by the primary physician
> to lack capacity* and no agent or guardian has been appointed or the agent or
> guardian is not reasonably available.

Miss. Code Ann. § 41-41-211(1) (Rev. 2023).

¶15.    The  evidence conflicts regarding whether Wydett's primary physician was the one

6

to determine if Wydett lacked capacity. Generally, "in order for one to act as a health-care surrogate, there must be a determination of a lack of capacity by a patient's primary physician." *Reed*, 37 So. 3d at 1159. That being said, "the authority of a health-care surrogate is limited to making 'health-care decisions.'" *Id.* (internal quotation marks omitted) (quoting *Hinyub*, 975 So. 2d at 218). If the decision was not a healthcare decision, then courts do not need to determine capacity since the statute deprives a surrogate of authority to bind the patient to any decision that is not a healthcare decision.

¶16.    Mississippi Code Section 41-41-203(h) defines *healthcare decision* as "a decision made by an individual or the individual's agent, guardian, or surrogate, regarding the individual's health care[.]" Miss. Code Ann. § 41-41-203(h) (Rev. 2023). These types of decisions involve the patient's health, not the sale of the patient's house or the management of the patient's bank account, which do not concern the care or health of an individual. *See* Miss. Code Ann. § 41-41-203(h)(i)-(iii) (Rev. 2023).

¶17.    In the instant case, Verna signed an arbitration agreement that was included in the admissions paperwork. This Court has held that an arbitration agreement "is part of the health-care decision when it is 'an essential part of the consideration for the receipt of "health-care.""[3] *Reed*, 37 So. 3d at 1159 (quoting *Hinyub*, 975 So. 2d at 218). But it is

---

[3]Manhattan argues that *Hinyub*'s discussion regarding whether an arbitration agreement is a healthcare decision is dicta and should be overruled. Instead, it asserts that *Dalon v. MS HUD Ocean Springs, LLC*, 283 So. 3d 90 (Miss. 2019), is the more appropriate approach. This Court is unpersuaded by Manhattan's arguments and declines its invitation to overrule *Hinyub.*

undisputed that execution of the arbitration agreement "[wa]s not a condition of, admission to, or requirement to continue to receive care at [Manhattan]." Like we said in *Hinyub*,

> Since signing the arbitration provision was not a part of the consideration necessary for [Wydett's] admission to [Manhattan] and not necessarily in the best interest of [Wydett] as required by the Act, [Verna] did not have the authority as [Wydett's] health care surrogate to enter into the arbitration provision contained within the admissions agreement.

*Hinyub*, 975 So. 2d at 218. Because Verna did not have the authority to execute the arbitration agreement, we find that the arbitration agreement is invalid and unenforceable.

## CONCLUSION

¶18.    The arbitration agreement was not essential consideration in order for Wydett to be admitted and receive healthcare from Manhattan. As a result, Verna lacked the authority to enter into the agreement, making the arbitration agreement invalid and unenforceable. For the reasons stated, this Court affirms the trial court's decision to deny the motion to compel arbitration and stay proceedings.

¶19.    **AFFIRMED.**

**RANDOLPH, C.J., KING, P.J, AND ISHEE, J., CONCUR.  GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY COLEMAN, P.J., AND BRANNING, J.**

**GRIFFIS, JUSTICE, DISSENTING:**

¶20.    Because I find that *Mississippi Care Center of Greenville, LLC v. Hinyub* should be overruled in part and that the execution of an arbitration agreement is a healthcare decision, I respectfully dissent.

8

¶21. Effective July 1, 1998, the Uniform Health-Care Decisions Act was adopted by the Legislature. Miss. Code Ann. § 41-41-201 (Rev. 2023). Under the Act, a "[h]ealth-care decision" is defined as

> a decision made by an individual or the individual's agent, guardian, or surrogate, regarding the individual's health care, including:
>
> (i) Selection and discharge of health-care providers and institutions;
>
> (ii) Approval or disapproval of diagnostic tests, surgical procedures, programs of medication, and orders not to resuscitate; and
>
> (iii) Directions to provide, withhold or withdraw artificial nutrition and hydration and all other forms of health care.

Miss. Code Ann. § 41-41-203(h) (Rev. 2023).

¶22. "This Court has found numerous times that signing an arbitration agreement is a healthcare decision." *Dalon v. MS HUD Ocean Springs LLC*, 283 So. 3d 90, 94 (Miss. 2019) (citing *Hinyub*, 975 So. 2d at 218; *Covenant Health Rehab of Picayune, L.P. v. Brown*, 949 So. 2d 732 (Miss. 2007), *overruled on other grounds by Covenant Health & Rehab. of Picayune, LP v. Est. of Moulds ex rel. Braddock*, 14 So. 3d 695 (Miss. 2009); *Vicksburg Partners, L.P. v. Stephens*, 911 So. 2d 507 (Miss. 2005), *overruled on other grounds by Est. of Moulds*, 14 So. 3d 695). In both *Stephens* and *Brown*, this Court allowed a surrogate, who had entered into an arbitration agreement on behalf of the patient, to bind

the patient to arbitration with the nursing home.[4] *Stephens*, 911 So. 2d at 510; *Brown*, 949 So. 2d at 742. Although the Court did not specifically state that entering an arbitration agreement was a healthcare decision, that was the result of both opinions.

¶23. In *Hinyub*, the Court found that "[Nancy] Hinyub did not have the authority as [her father]'s healthcare surrogate to enter into the arbitration provision contained within the admissions agreement" since "[n]either party present[ed] a declaration by [Hinyub's father's] primary physician stating that [he] was incapable of managing his affairs prior to Hinyub's signing the admissions agreement with the arbitration agreement." *Hinyub*, 975 So. 2d at 218. Although the Court could (and should) have stopped there, it went further.

¶24. The Court noted that "[a]dditionally, under the Act, the authority of a health-care surrogate is limited to making 'health-care decisions.'" *Id.* The Court held:

> While in both *Covenant Health Rehab of Picayune v. Brown*, 949 So. 2d 732 (Miss. 2007) and *Vicksburg Partners, L.P. v. Stephens*, 911 So. 2d 507 (Miss. 2005), this Court found that execution of the arbitration provision as part of the admissions agreement was part of the "health-care decision," the arbitration provision was an essential part of the consideration for the receipt of "health care" in those instances. On the other hand, in today's case, Hinyub was not required to sign the arbitration provision to admit [her father] to the Mississippi Care Center of Greenville [(MCCG)]. In fact, the admissions agreement clearly stated:
>
> > the execution of this [a]rbitration is not a precondition to the furnishing of services to the [r]esident by the [f]acility. . . .

---

[4] The Court found that certain portions of the agreement were unconscionable and struck those portions, but it enforced the remainder of the agreement. *Stephens*, 911 So. 2d at 525-26; *Brown*, 949 So. 2d at 741.

Since signing the arbitration provision was not a part of the consideration necessary for [Hinyub's father]'s admission to MCCG and not necessarily in [his] best interest . . . , Hinyub did not have the authority as [her father]'s healthcare surrogate to enter into the arbitration provision contained within the admissions agreement.

*Hinyub*, 975 So. 2d at 218.

¶25.    As a result of *Hinyub*, the execution of an arbitration agreement is considered a healthcare decision under the Act only if the execution is mandatory for admission. *Id.*; *see also Est. of Moulds*, 14 So. 3d at 711 (Graves, P.J., concurring in result only) ("In sum, the rule after *Hinyub* is that the surrogate can bind the patient to arbitration only if the arbitration clause is a necessary, non-negotiable element of the entire admission contract. If the arbitration clause is not a required part of the contract, then the surrogate cannot bind the patient to arbitration.").

¶26.    In September 2019, more than ten years after *Hinyub*, the Center for Medicare and Medicaid Services (CMS) enacted regulations regarding the requirements for long-term-care facilities to participate in the Medicare and Medicaid programs. 42 C.F.R. § 483.70 (West, Westlaw through Feb. 2, 2026). Section 483.70(m) discusses "[b]inding arbitration agreements." 42 C.F.R. § 483.70(m) (West, Westlaw through Feb. 2, 2026). Under Section 483.70(m)(1),

The facility must not require any resident or his or her representative to sign an agreement for binding arbitration as a condition of admission to, or as a requirement to continue to receive care at, the facility and must explicitly inform the resident or his or her representative of his or her right not to sign the agreement as a condition of admission to, or as a requirement to continue to receive care at, the facility.

11

42 C.F.R. § 483.70(m)(1) (West, Westlaw through Feb. 2, 2026). Thus, under Section 483.70(m)(1), a long-term-care facility such as a nursing home can no longer require or make mandatory for admission the execution of an arbitration agreement. *Id.*

¶27. According to Manhattan Nursing and Rehabilitation Center, LLC, Ashley Bouldin, LPN, and Fredia Harvey, LPN (collectively, "Manhattan"), Section 483.70(m)(1) "creates an impossible scenario for nursing homes in this state." Manhattan explains:

> Under the "***Hinyub*** analysis," an arbitration agreement signed by a patient's health care surrogate is only enforceable if it is mandatory for admission, making it an "essential part of the consideration for the receipt of 'health care.'" ***Hinyub***, 975 So. 2d at 218. However, under federal regulation, a nursing home cannot make an arbitration agreement "a condition of admission" or a "requirement to continue to receive care" at a facility. 42 C.F.R. § 483.70(m). This effectively means that a nursing home [that] follows the federal regulation and presents a voluntary arbitration agreement to an incapacitated resident's surrogate will never be enforceable in Mississippi under ***Hinyub***, because the arbitration agreement is not mandatory for admission to the facility.

I agree and find the ***Hinyub*** Court's determination that a surrogate's execution of an arbitration agreement is a healthcare decision only if the execution is mandatory for admission should be overruled. Whether an arbitration agreement is mandatory or voluntary should not affect the scope of authority.

¶28. Long-term-care facilities such as nursing homes are not hospitals that provide acute care for a short period of time. They are the actual home of the individual, often for the rest of his or her life. As a result, nursing-home-admission agreements include many different agreements that the individual or the individual's representative executes upon admission.

12

Indeed, during the admission process, an individual or his or her representative routinely makes decisions that are *not* a direct provision of medical services. Individuals assign certain rights such as their Medicare and/or Medicaid benefits directly to the facility to pay for their room and board. Individuals also authorize the facility to open a trust account on their behalf to manage their cash flow. Similarly, the manner in which healthcare-related disputes are to be resolved is one of the many crucial decisions an individual or his or her representative must make upon admission.

¶29.   In Mississippi, there are 209 licensed nursing-home facilities.[5] All but eight of those 209 nursing home facilities are Medicare and/or Medicaid certified.[6] Thus, under Section 483.70(m)(1), approximately 96 percent of the nursing-home facilities in Mississippi cannot require a resident or his or her representative to sign an arbitration agreement as a condition of admission or receipt of care.  § 483.70(m)(1).  And the alternative, i.e., an optional arbitration clause, is unenforceable under ***Hinyub***.  ***Hinyub***, 975 So. 2d at 218.  As a result, under ***Hinyub***, the ability to enforce a *valid arbitration agreement* is virtually nonexistent. ***Id.***

¶30.   Under the Federal Arbitration Act (FAA), arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]" ***Kindred Nursing Ctrs. Ltd. P'ship v. Clark***, 581 U.S. 246,

---

[5] Mississippi State Department of Health, *Directory of Mississippi Health Facilities* (Jan. 26, 2026), https://msdh.ms.gov/page/resources/7660.pdf.

[6] *Id.*

13

251, 137 S. Ct. 1421, 197 L. Ed. 2d 806 (2017) (internal quotation marks omitted) (quoting

9 U.S.C. § 2).

> That statutory provision establishes an equal-treatment principle: A court may invalidate an arbitration agreement based on "generally applicable contract defenses" like fraud or unconscionability, but not on legal rules that "apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue."

*Id.* (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 131 S. Ct. 1740, 179

L. Ed. 2d 742 (2011)). In light of Section 483.70(m), if we continue to follow the reasoning

set forth in *Hinyub*, it will impede the ability to enforce a valid arbitration agreement in

opposition to the FAA's "equal-treatment principle." *Id.* (quoting *Concepcion*, 563 U.S. at

339).

¶31. Verna asserts that arbitration is not "singled out." She claims that "for the other half

of residents"[7] unable to sign optional arbitration agreements, "there are other avenues of

authority including . . . [general] powers of attorney . . . or a conservatorship[.]"[8] I disagree.

The vast majority of nursing-home residents are on Medicare and/or Medicaid and do not

have the time or resources to seek legal advice or obtain a power of attorney or

---

[7] Verna admits that half of all nursing-home residents have been diagnosed with Alzheimer's or dementia, requiring someone other than the resident to authorize admission to the facility and, in turn, an arbitration agreement.

[8] Verna also asserts that an agent with authority under a healthcare power of attorney can submit to arbitration on the individual's behalf. But under the Act, an agent designated under a power of attorney for healthcare, like a surrogate, can only make "health-care decision[s] for the individual[.]" Miss. Code Ann. § 41-41-203(c) (Rev. 2023). And under *Hinyub*, the execution of an arbitration agreement is a healthcare decision only if mandatory for admission.

conservatorship. More importantly, the inability to sign optional arbitration agreements is not the problem. The problem is that even when an individual's healthcare surrogate is able to sign and does sign an optional arbitration agreement, that agreement cannot be enforced in the state of Mississippi under *Hinyub* even if valid and otherwise enforceable.

¶32. Verna also claims that "*Hinyub* does not disfavor arbitration" but, instead, "disfavor[s] every optional contract that is not necessary to ensure care for the resident." Under *Hinyub*, however, an optional arbitration agreement is unenforceable (even if valid), while other optional agreements such as a Medicare/Medicaid benefits assignment or a trust-fund agreement remain valid and enforceable. Verna asserts voluntary Medicare assignments and trust-fund agreements are not optional but, instead, "necessary to receive medical care" since "these agreements ensure payments for the healthcare services rendered by the facility." But these agreements are just as optional as an arbitration agreement because they provide an *option* for directing payment. Indeed, if these documents are not signed during admission, the individual and/or his or her representative will receive the bill directly. Yet despite their optional nature, these agreements remain in effect while voluntary arbitration agreements are continuously struck and invalidated under *Hinyub*.

¶33. There is no reason an individual's healthcare surrogate cannot agree to arbitrate a healthcare dispute. Absent a generally applicable contract defense, an individual's surrogate should be able to bind the individual to arbitration. But because of the Court's interpretation in *Hinyub*, and in light of Section § 483.70(m)(1), a voluntary (i.e., not mandatory), valid,

15

and otherwise enforceable arbitration agreement is unenforceable. The *Hinyub* Court's determination that a surrogate's execution of an arbitration agreement is a healthcare decision only if the execution is mandatory for admission should be overruled.

¶34.　In *Dalon*, the patient's son voluntarily signed an admission agreement that included an arbitration agreement. *Dalon*, 283 So. 3d at 92, 95. When the nursing home moved to compel arbitration, the son objected, arguing "that while the [h]ealthcare [power of attorney] vested him with the authority to make healthcare decisions for [his mother], it did not permit him to waive [her] constitutional right to a jury trial or her right to full legal redress." *Id.* at 94. In other words, the son argued that the execution of the arbitration agreement was not a healthcare decision. The Court disagreed. *Id.*

¶35.　Relying on the Act, specifically the Act's definition of "[h]ealth-care decision," the Court found that the son's "decision to sign the arbitration agreement [wa]s considered a healthcare decision that the [h]ealthcare [power of attorney] authorized him to make on [his mother]'s behalf." *Id.* Notably, the Court did not distinguish between arbitration agreements required for admission versus those that were optional. *Id.* Instead, the Court noted that it "ha[d] found numerous times that signing an arbitration agreement [wa]s a healthcare decision." *Id.* (citing *Hinyub*, 975 So. 2d at 218; *Brown*, 949 So. 2d 732; *Stephens*, 911 So. 2d 507).

¶36.　Having found that the execution of an arbitration agreement was a healthcare decision, the Court then went on to consider whether the arbitration agreement was unconscionable.

16

*Id.*  Because the arbitration agreement was neither procedurally nor substantively unconscionable, the Court enforced the agreement.  *Id.* at 95, 96.

¶37.  I find the approach set forth in ***Dalon*** is proper.  The execution of an arbitration agreement is a healthcare decision under the Act.  ***Dalon***, 283 So. 3d at 94.  Consistent with the Court's liberal approach to arbitration, ***Dalon***, 283 So. 3d at 93 (quoting ***Qualcomm Inc. v. Am. Wireless License Grp., LLC***, 980 So. 2d 261, 269 (Miss. 2007)), if a healthcare surrogate executes an arbitration agreement, the arbitration agreement should be enforced unless the agreement is revocable "upon such grounds as exist at law or in equity for the revocation of any contract."[9]  9 U.S.C. § 2.  Stated differently, a healthcare surrogate can bind an individual to arbitration as long as the arbitration agreement is not revocable based on applicable contract defenses such as fraud, duress, or unconscionability.  *Id.*

**COLEMAN, P.J., AND BRANNING, J., JOIN THIS OPINION.**

---

[9] "[O]nly generally applicable contract defenses, such as fraud, duress, or unconscionability, can be used to invalidate arbitration provisions or agreements[.]" ***Stephens***, 911 So. 2d at 514.

17